## HOLLAND FURNITURE CO. *v.* KNOOIHUIZEN.[1]

1. CORPORATIONS—LIABILITY OF MANAGER FOR ASSETS—ACCOUNTING.

> The manager of a furniture company cannot be compelled to account for the proceeds of sales of samples of the company where no record is made on the books and such proceeds are used in paying notes of a third person on which the company was liable, and of which there was also no record on the corporate books.

2. SAME.

> A settlement between the representatives of the estate of a deceased officer of a furniture company and such company whereby the company acknowledges payment in full and releases and discharges all claims of the company

197—Mich.—16.

against the estate includes outstanding "kited" paper which was illegally issued by such deceased officer but which an audit of the books had disclosed, and the fact that the successor of deceased renewed or kept alive such obligation is immaterial.

3. SAME.

Where defendant, instead of charging an account to profit and loss, improperly credited the debtor and charged the amount to commissions and thus wiped out the account, he cannot be charged with the account if it was fictitious and the company thus suffered no loss.

4. SAME.

Defendant officer could be required to account for the sum paid out of corporate funds to a third person in satisfaction of a personal note.

5. SAME.

Where defendant manager had no authority to subscribe for stock in another corporation in the name of the company, he could not recoup his loss by canceling a valuable lease held by the company, taking a new lease in his own name and then profiting by subleasing to his own and other companies, and he must account for the money thus received.

6. SAME.

Defendant manager could be compelled to account to the company for the unearned portions of the salary of his deceased predecessor where, without authority, he credited the account of such deceased officer with the amount of salary unearned in the month that deceased died, as well as with the earned portion, and used the proceeds to pay debts of such deceased officer.

7. SAME.

Where an officer of a corporation collects on small sales of merchandise without making any entry of the proceeds on the books, he is bound to account therefor if he is unable to show that he has paid out such proceeds in satisfaction of an increased salary to another officer.

8. SAME.

A managing officer of a corporation may be required to account for excess interest paid to a relative on a loan made by her to the company where he pays interest on the full amount of the loan, disregarding previous payments on the principal.

9. SAME.

Where a managing officer of a corporation cancels an indebtedness of a relative and employee of the company by crediting such employee with labor and such employee had been receiving full payment of his salary and an extra amount not appearing on the pay roll and there was nothing due him, such officer may be required to account for the amount of such indebtedness.

10. SAME.

A managing officer of a corporation may be required to account to the corporation for the reasonable value of work performed on property of his relations by employees of the company at his order and without charge, especially where work could have been found for the men to do at the plant of the company.

11. SAME.

Where defendant officer kept no record of the time of the employees while they were working on the premises of his relatives he cannot be heard to complain, in a suit by the company for an accounting, of the indefiniteness of the proof, when he is required to account for the reasonable value of such work.

12. SAME.

Where a defendant corporate officer used the labor of employees of the company to construct a residence for himself and fitted his house with specially designed furniture made in the plant and no record was kept of the time of such employees he may be compelled to account for the reasonable value of such labor and of such furniture.

13. SAME.

A managing officer of a furniture corporation, having charge of the making of all contracts for the company, who receives valuable gifts from companies with which the company deals and uses such gifts in the construction of a home, commits a breach of trust and may be required to account for the value of such gifts.

Appeal from Ottawa; Cross, J. Submitted April 12, 1917. (Docket No. 80.) Decided July 26, 1917.

Bill by the Holland Furniture Company against Albert Knooihuizen for an accounting. From the de-

cree rendered, both parties appeal. Modified and affirmed.

*Charles H. McBride* and *Wilkes & Stone,* for plaintiff.

*Diekema, Kollen & Ten Cate (Colin P. Campbell,* of counsel), for defendant.

FELLOWS, J.   Plaintiff, a Michigan corporation with capital stock of $50,000, was organized in 1890 by one Jacob G. Van Putten and associates, to manufacture furniture at the city of Holland.   Van Putten and his relatives controlled about two-thirds of the stock, and he was its active manager until his death January 9, 1909.   Defendant was a brother-in-law of Van Putten, a physician by profession, and from 1900 until Van Putten's death was assistant to his brother-in-law.   On Van Putten's death he succeeded as manager, and had charge of and conducted the business of plaintiff until October, 1914.   He also held the offices of secretary and treasurer, and was authorized to borrow money, execute notes of the company, purchase material, and possessed such general powers as are usually incident to the positions held by him in the company.   This bill was filed for an accounting covering the period of his management.   Many items were allowed and several disallowed.   From those allowed defendant appeals; from those disallowed plaintiff appeals.   This necessitates a consideration of all the items involved in the transactions between defendant and the company covering nearly six years.   A satisfactory disposition of the case requires a separate consideration of each of the transactions questioned.

*The Shephard Deal.*   We are satisfied from this record that during the Van Putten administration, and covering a period of many years, note kiting was conducted by him on a large scale.   Negotiable paper of plaintiff in considerable amounts was issued, without

consideration, to different parties and disposed of to *bona fide* purchasers. Plaintiff, through Van Putten, indorsed other paper, likewise floated. This dishonest practice seems to have been conducted with nothing but a suspicion on the part of some of the board of directors of its existence, and without even suspicion on the part of others. The directors did not direct; they only met twice a year, and then only to declare dividends, and did not apparently, feel that they owed the duty to the company of familiarizing themselves with the affairs of the company, and directing its activities. Had they discharged their duty as directors it is highly improbable that loss would have fallen on the company through these illegal practices. As it was, Van Putten was permitted to entirely dominate and control the company as he saw fit. This kited paper was issued without check and without entry on the bills payable of the company, and while some of it was paid by the parties for whose benefit it was issued, much of it was not. Van Putten seems to have attempted to keep an account of it on a private book, but we are not certain from this record that he entered it all. So far as this fictitious paper is involved we are concerned only as to the so-called "Shephard deal" and the "C. L. King & Co. deal"; to the latter we shall presently refer. The other kited paper had been retired by the parties for whose accommodation it was issued.

One A. L. Shephard was a designer and later sales manager of plaintiff. We are satisfied that under the Van Putten administration of this company at one time there was outstanding of so-called Shephard paper, on which plaintiff was liable, $13,000, paper for which plaintiff received no consideration, but which was issued as above stated, for Shephard's accommodation, and which found its way into the hands of *bona fide* purchasers. Shephard was interested in a

zinc mine, and it is highly probable much of this money was sunk in this mine, but we are satisfied that it all took place during the Van Putten administration, and that the claim of plaintiff that defendant had to do with the diversion of the funds of plaintiff to the zinc-mining proposition of Shephard is entirely without foundation. Defendant did purchase $500 worth of stock in the mine, but traded it for sugar stock, and was out of the mining deal long before Van Putten's death. We are also satisfied that at the time of Van Putten's death Shephard was totally irresponsible, and that this accommodation paper, somewhat reduced in amount, was in the hands of the National Bank of Sturgis, of which a Mr. Anthony was cashier.

Soon after the installation of defendant as manager of the company he learned of the existence of the kited paper by notices from banks holding it. Instead of calling the board of directors together and laying before them the situation as he should have done, and placing those obligations of the company on the books of the company, he arranged to take care of them by renewals and payment out of the assets of the company, without the transactions being accurately recorded in the company's books. Van Putten was his brother-in-law, had stood high in the city of Holland, had been postmaster, treasurer, and mayor of that city, and was respected by its citizens. Defendant chose the wrong course to protect his memory.

Furniture manufacturers hold two sales annually at Grand Rapids, one in January and one in July. They there exhibit their samples and take orders from furniture dealers. This sample furniture is usually sold after the sales are over to parties making a business of dealing in sample furniture. For three successive sales defendant disposed of the samples exhibited, and turned in the notes received in payment to extinguish the liability of the company on the Shephard notes.

The Shephard notes did not appear on the books of the company, and he made no entry of the sales of the sample furniture on the books of the company. His conduct deserves the severest condemnation, but we cannot say that he has not accounted for the proceeds of these sales. He has used the assets of the company to discharge the legal liability of the company.

Under the circumstances of this case and his manner of handling company assets, defendant must be held to the strictest accountability, but where he has used company assets to reduce company liabilities, he cannot be personally charged with such assets, because his bookkeeping, or want of bookkeeping, leaves him open to suspicion and a most rigid examination of every item of his accounting. Decrees cannot pass in the face of the only testimony appearing in the record, nor upon plausible innuendoes based upon an ingenious assorting of bits of testimony gathered here and there from hundreds of pages of cross-examination. The trial court was satisfied, and found that the notes which were received from the sale of sample furniture went to pay the Shephard notes which the company was legally obligated to pay, and that defendant should not account for them. A careful reading of this record of 717 pages convinces us that he reached a correct conclusion on this item.

*The C. L. King & Co. Deal.* Under the Van Putten administration the practice of kiting paper was indulged in with C. L. King & Co. This was a Holland institution, and was managed by W. W. Hanchett. Plaintiff was obligated on over $19,000 of King & Co. paper when defendant became manager. Before Van Putten's death King & Co. had sold its plant to the Eastern Basket & Veneer Company, taking stock in that company in payment. It, however, continued to transact some business at Holland. Soon after defendant became manager he received notice that one

of the King & Co. notes was due. He found no record of it on the books of the company, and at once sought out Mr. Hanchett. From him he learned the extent of the liability of the company on the King & Co. paper. It was scattered in various banks, and defendant consulted the attorney for the company as to the most advisable course to pursue. King & Co. could not pay these notes, neither could plaintiff, with cash then on hand. It was hoped that King & Co. would eventually pull through and be able to pay its debts. There was but one thing to do as the parties then viewed it, and that was to renew the paper. It was paper issued by defendant's predecessor, and was in the hands of *bona fide* holders. Defendant renewed it from time to time as it fell due, sometimes in the same bank, sometimes by placing loans in other banks for the purpose of taking it up. These renewals were not entered in the bills payable account of the company. King & Co. went into the hands of a receiver. The exact date does not appear, but plaintiff's original claim against it, filed in the district court for the western district of Michigan, bears date September 29, 1913. An audit of the books of plaintiff company was first had covering the period from January 1, 1909, to December 31, 1913; another and later audit covered the period from January 1, 1914, to October 27, 1914, and still later a thorough audit of both the Van Putten and defendant's administrations was had. These audits revealed the situation, and showed that under neither administration did the books show the actual situation of the company; they showed many fictitious entries and accounts running through Van Putten's administration, some of which were not rectified or closed out by defendant. In October, 1914, defendant sold his stock in the company to the present controlling interest, and resigned.

February 16, 1916, this bill was filed. This was be-

fore the audit covering defendant's administration had been completed. At about the same time plaintiff also filed a petition in probate court to revive the commission on claims in the estate of Jacob Van Putten, and also filed a bill to recover stock claimed to have been fraudulently issued by Van Putten to himself. The representatives of the plaintiff, and of the Van Putten estate got together to see if an adjustment could not be made. After considerable discussion a settlement was arrived at. The Van Putten estate turned over 2,223 shares of stock of plaintiff company, worth $44,-460, and surrendered a dividend of $2,223, declared, but not then paid, and plaintiff executed a release, acknowledging "payment in full, and to release and discharge all claims of every nature which the said Holland Furniture Company now has against the said executors and the said estate of Jacob G. Van Putten, deceased." It is now claimed by plaintiff that this settlement did not include the King & Co. paper, and that defendant ought now to account for the amount of such paper renewed by him. It is unnecessary for us to determine whether defendant has by his conduct rendered himself liable, either by what he actively did in renewing this paper, or by what he passively did by not proceeding at once against King & Co. on learning of the outstanding paper, as we are clearly satisfied that the King & Co. deal was settled and closed by this settlement with the Van Putten estate. The King & Co. paper was originally issued by Van Putten in his lifetime. He was liable to the company for the loss suffered by it through the issue of this fictitious paper; the audit covering the Van Putten administration was in the hands of plaintiff at the time this settlement was made, and disclosed the King & Co. transaction. When plaintiff settled with the Van Putten executors and took the equivalent of $44,460, it closed and settled all liabilities of the Van Putten estate to it, and it can-

not now call to account Van Putten's successor for renewing or keeping alive a legal liability created against the company by Van Putten in his lifetime.

*The W. C. Grobheiser Account.* We have already stated that the audit of the books of the company disclosed many fictitious accounts. When defendant became manager he found a charge on the books against W. C. Grobheiser of $1,250. He satisfied himself that Mr. Grobheiser did not owe the company anything. There is no proof or shadow of evidence other than the account itself of any indebtedness from Grobheiser to the company. Instead of charging this to profit and loss, defendant, on two different occasions, credited Grobheiser and charged the amount to commissions, and thus wiped out the account. This was an improper manner of disposing of this account, but the company suffered no loss in wiping off this fictitious account, nor did defendant profit by it. He should not be charged with this account.

*Fruit Growers' State Bank Note.* On March 17, 1909, defendant paid with company funds a note given by himself and Jacob G. Van Putten, amounting to $2,575. This note had not been found when this bill was filed, nor at the time of the settlement with the executors of the Van Putten estate. It was later found with some other canceled notes in an old safe. Defendant seeks to connect this note with the Shephard deal, but it was his personal obligation, and he paid it with company funds. He must account to the plaintiffs for this sum.

*Manufacturers' Building Lease.* The semi-annual furniture sales at Grand Rapids, and the fact that plaintiff there exhibited its samples, has been noted. The plaintiff held a lease for floor space in the Manufacturers' Building for the purpose of making this exhibit of its wares. During the administration of defendant, Luce Redmond Company surrendered a

lease of floor space adjoining that occupied by plaintiff, and a lease was first made with plaintiff for this space. Later defendant caused this lease to be canceled, and took one in his own name; the company, however, paid the full rent. A portion of the floor space was sublet by defendant, and he received $1,400 therefor. Defendant's explanation of this transaction is that he subscribed in the company's name for stock in a new hotel at Grand Rapids which was deemed necessary by the furniture trade to accommodate the dealers who visited these sales, that the directors of the plaintiff declined to ratify this transaction, and that he took this course to repay his loss occasioned by the purchase of this stock, which, he claims, was for plaintiff's benefit. His explanation does not relieve him from accounting for this sum. He had no authority to subscribe in the name of plaintiff for stock in another corporation, and he could not recoup loss suffered by him through his unauthorized act by canceling a valuable lease held by the company of which he was manager, take a new lease in his own name, and then profit by subleasing to his own and other companies. He should be charged with this amount.

*Jacob G. Van Putten Accounts.* After the death of Van Putten defendant paid sundry of his bills due at his death, aggregating $158.36, with company funds. Van Putten's account on the books of the company showed a debit balance of $79.58. To close this account and balance these items defendant credited Van Putten's account with salary for February, $209, and expenses, $28.94, making $237.94. Although Van Putten died on January 9th, his salary for the full month was credited to defendant's account, and he claims to have used it to pay Van Putten's debts. The trial court charged defendant with the $237.94, but declined to charge him with the portion of the January

salary covering the period after Van Putten's death. We agree with the trial court that defendant should be charged with the $237.94, but we are also impressed that he should be charged with that portion of the January salary subsequent to Van Putten's death. As between defendant and the Van Putten estate, he may have a claim, but as between him and the plaintiff he had no right to use the company's funds to pay other than company's obligations. When Van Putten died his salary ceased, and we are not concerned with the inquiry as to whether it would have been a gracious act for the company to have voted the unearned portion of the January salary to the Van Putten estate. It did not do so, and the defendant as its manager had no right to use its funds for the payment of Van Putten's debts. This item will be increased as indicated.

*M. Tromp and E. H. Bradwell Accounts.* Defendant sold to these parties merchandise belonging to plaintiff, collected pay, and the books give no evidence of the transactions. Defendant admits that these accounts were collected by him, and insists that they went in as "petty cash," and that from this petty cash he paid to his brother Charles to make up the amount of his agreed salary, which was more than appeared on the pay rolls or books of the company. The brother was a witness and confirmed the arrangement that he was to receive more salary than the books show, and testifies that he received this extra stipend at regular intervals. The dates of payment of the extra allowance do not correspond with the dates when these accounts were collected. One of the accounts amounted to $157.08, and could not very well be called petty cash. The defendant was bound to account for these items. The trial court was not satisfied that he had done so, and we are not persuaded that he reached a wrong conclusion. These items will stand as allowed by the circuit judge.

*Mrs. R. Knooihuizen, Loan.* The mother of the defendant loaned money to the plaintiff. She received payments on her note from time to time as her needs required. She was, however, during defendant's management of the company, as she apparently was during the Van Putten administration, paid interest on the full amount of her loan without taking into account any payments made thereon. By so doing she was paid by the defendant from plaintiff's funds $158.06 in excess of the amount she was entitled to. Defendant should account for this amount.

*Charles Knooihuizen Account.* The books of the company showed that defendant's brother Charles owed the company $215.11. The indebtedness is admitted. On the day defendant resigned as manager he caused this account to be closed by crediting his brother the amount of this account for labor. We have already stated that it is the claim of the defendant that he was paying his brother an extra amount beyond the salary appearing on the pay roll. We have already stated that Charles testified that he was receiving this extra compensation at stated times. If Charles is correct in his version of the arrangement and the manner of carrying it out, there was no such sum as this due at this time. It is quite apparent that this was a gratuity to Charles. Defendant could not thus make free with plaintiff's funds, and must account for this sum.

*Labor Performed for Defendant's Relatives.* By instructions from defendant, employees of plaintiff did work in painting the house of defendant's mother, and also did work on the new house and garage of his brother Charles. The company paid the men for their time while thus employed. Defendant kept no account of the amount of time of any of these men while so employed, and did not make any charge or collect anything from either Mrs. Knooihuizen or Charles. Plain-

tiff is unable to fix the amount of the time of the men so used, but did produce witnesses who gave evidence as to what the work was reasonably worth. Defendant objects to the allowance made, claiming that the men only worked at odd times when it did not interfere with their work in the plant, and that the evidence is too indefinite. We cannot agree with defendant in this contention. Had the men not been away from the plant, the evidence discloses, and it must be quite evident, work would have been provided for them there; they would not have been left idle, but would have been kept at work by their employer. As to the indefiniteness of the proof, it is sufficient to say that it was within the power and it was the duty of the defendant to keep an account of the time of the men when in the pay of plaintiff and working elsewhere by his directions, and he cannot be heard to complain when called to account if he is charged what such work was reasonably worth. But defendant insists that the evidence does not show all the work to have been done that is claimed by plaintiff was done, and does not authorize the allowance made. We agree that as to two of the items allowed for work in Charles Knooihuizen's house defendant is correct; as to the balance of the items we are impressed the trial court reached the correct result. The trial court charged "for finishing dining room, $51." We are unable to find from the evidence that plaintiff's employees did this work. Counsel for plaintiff concede that it was not done, but insist that the sum of $51 should be charged for shellacking and sanding the stairway. We are unable to find support in the testimony for this claim, Charles Knooihuizen, while admitting that some work was done by plaintiff's employees, testified that the work of finishing the woodwork was done by his brother-in-law. He was, so far as disclosed by this record, a fair witness. While there is some evidence

of work of this character being done, we are satisfied that if any was done it was inconsequential in amount, and the items under this head will be reduced by this item of $51, and another item of $55, for "labor finishing living room and hall," making a total of $106, and the other items allowed as found by the circuit judge.

*Defendant's New House and Furniture.* During defendant's administration he built a new house costing around $12,000. The evidence is convincing that the workmanship on it was the best, and that the skilled employees of plaintiff were used, at the expense of the company, to make it an up-to-date residence. Furniture of special design was made in the plaintiff's plant by its employees, and no account was made of their time, or any charge made. The rule laid down under the preceding head of charging defendant the reasonable value of the work done must be here followed. He must also be charged with the reasonable value of the furniture made for him by the plaintiff. In the main we agree with the trial judge as to the amounts found by him. Four witnesses gave evidence as to the value of the furniture; some were below, while others were above, the figures found by the circuit judge. We are not persuaded that we should change his values on the furniture, except in one particular. He charged defendant with a white enamel bedroom suit, $75. We think this item should be reduced to $40, as the evidence satisfies us that was its value. We also reduce the allowance by the further sum of $160.69, the value of the walnut and mahogany lumber which were used in making up this furniture, and which will be considered under the next head. It will not be necessary for us to discuss each item involved in this transaction; except as above noted, we agree with the figures found by the trial court.

*Gifts to Defendant.* During the time defendant was building his house he received valuable gifts from the companies with whom plaintiff was dealing, and from whom it, acting through defendant, purchased merchandise. These gifts were not such as usually pass between friends, but were valuable articles of commerce, mahogany and walnut lumber and veneer and varnish. The defendant was the manager, secretary, and treasurer of the plaintiff. He made its contracts with the companies making these gifts; was the officer authorized to purchase lumber and varnish. By accepting these secret gifts from companies holding these relations with the plaintiff he committed a breach of the trust held by him, and must account to the company for the value of the property so received. Section 650, 3 Cook on Corporations (7th Ed.), p. 2023. This lumber was used by him for his personal benefit in building his house and making the special furniture for it. There is no dispute as to the amount of it or its value. The varnish was also used in his house; its value is not agreed upon. The trial court did not allow these items. They should be allowed. We charge defendant with $580 for lumber and veneer, and $38.25 for varnish.

As modified herein, the decree of the court below will be affirmed. Plaintiff will recover interest at 5 per cent. on the various sums allowed.

Both parties appealed. We have slightly increased the amount of the decree entered in the court below, but not sufficient to justify allowing full costs. Each party will pay for printing briefs. No attorney fees in this court will be allowed; plaintiff will pay 45 per cent. of the other costs of appeal, and defendant will pay 55 per cent.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.