**ASHMAN et al. v. MILLER et al.**

No. 7813.

Circuit Court of Appeals, Sixth Circuit.

Jan. 13, 1939.

86

both of Chicago, Ill. (Gilruth, Beck & McConnell, Thomas C. McConnell, and Irwin T. Gilruth, all of Chicago, Ill., Prentiss M. Brown, of St. Ignace, Mich., and George D. Smith, of Chicago, Ill., on the brief), for appellants.

B. J. Onen, of Battle Creek, Mich., and Wm. R. Walsh and Joseph Walsh, both of Port Huron, Mich. (Bernard J. Onen, of Battle Creek, Mich., and Walsh, Walsh & O'Sullivan of Port Huron, Mich., on the brief), for appellees.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

In the court below appellant Lewis Ashman, a citizen of Illinois and the owner of a voting trust certificate for 100 shares of the stock of Federated Publications, Inc., a Delaware corporation and an appellee, filed a petition against the Federated and Albert L. Miller and Louis A. Weil, its directors and voting trustees, and S. W. McFarland, director, Paul A. Martin, Louis A. Weil, Jr., and Robert B. Miller, its employees, all citizens of the State of Michigan. Later Russell J. Boyle and Geo. D. Smith intervened as plaintiffs. The appellants were all owners of voting trust certificates acquired before any of the acts of the corporate officers of which they complain were committed and instituted this action on their own behalf and others similarly situated who wished to intervene, and its purpose was to re-. cover stock and money received by the individual defendants out of the assets of the corporation or profits on the purchase of its stock which it is charged should have been acquired for the corporation. It was alleged that the corporation would not maintain the action against the individuals because it was under their domination.

Proofs were taken and after final hearing the District Court entered decree dismissing the original and intervening petitions from which this appeal is prosecuted.

In 1928 three corporations were engaged in the business of publishing newspapers in the State of Michigan; the Lansing State Journal, Lansing, Michigan; the Enquirer News, Battle Creek, Michigan and the Herald Publishing Company, Grand Rapids, Michigan. The Newspaper Engraving Company, Grand Rapids, Mich-

Lucking, Van Auken & Sprague and Harry Helfman, all of Detroit, Mich., and Thos. C. McConnell and Irwin T. Gilruth,

igan, was engaged solely in printing and engraving.

During this year the appellant Russell J. Boyle, a member of the brokerage firm of Fenton, Davis & Boyle of Grand Rapids, Michigan, together with the brokerage firms of Nichols, Terry & Company, Chicago, Illinois, and Keane, Higbie & Company, Detroit, Michigan, caused to be organized under the laws of Delaware for the purpose of acquiring all of the capital stock of the above named corporations, the appellee Federated Publications, Inc.

It issued and sold to the public 50,000 shares of its common stock, no par value, at $20 per share. Fifty-two thousand shares of no par preferred were issued at $25 per share, 48,000 of which were sold to bankers and brokers and 4,000 issued to appellant Boyle for services.

There was also issued and sold at a discount of 7%, $2,500,000 of so-called gold notes. All of the capital stock of the foregoing corporations was acquired by the Federated Publications, Inc., for $4,606,055 and pledged to a trustee to secure its issue of gold notes. The 52,000 shares of preferred stock were convertible into common, share for share, and callable on thirty days' notice at $32 per share and subsequent to its issue were so converted.

As a part of the organization of the Federated and for the purpose of having its affairs managed and directed for a period of ten years under a definite policy of editing and publishing newspapers, a voting trust of all its common stock was created November 1, 1928, with appellant Russell J. Boyle, appellee Albert L. Miller and Arthur H. Vandenberg, trustees, and there was deposited with them 50,000 shares of the common stock and the converted preferred under a conventional form of voting trust agreement and trustee certificates issued therefor. Vandenberg resigned in 1932 and appellee Louis A. Weil, who had no interest in the company, succeeded him.

Under the terms of the voting trust, the trustees were expressly permitted to act as directors or officers of the corporation or become pecuniarily interested in any matter or transaction to which it was a party or to buy, hold, own, sell or otherwise acquire and dispose of any voting trust certificate as individuals.

On December 29, 1932, the Board of Directors by corporate resolution for the purpose of lessening the annual franchise tax due the State of Michigan reduced on its books the asset value of the stocks in the subsidiary companies by $2,000,000.

On October 11, 1933, appellee Weil purchased from the Fort Investment Company (in receivership) for $1.50 a share, voting trust certificates representing 15,746 shares of the stock of Federated. The initial payment of $5,000 was procured by him from appellee Miller who in turn obtained it from the Federated by a charge against Miller's salary account in which he had a balance of more than $5,000. The remainder of the purchase price was represented by Weil's note October 11, 1933, for $18,619 payable in five annual installments with the stock as collateral. The balance of the note was paid out of a dividend of 25 cents on 49,318 shares declared August 23, 1935, and a dividend of $1.20 a share declared on July 15, 1936.

Appellee Weil, on January 22, 1934, also purchased from the Guardian National Bank, Detroit, Michigan (in receivership), voting trust certificates representing 32,-822 shares of Federated at $1.50 a share. The cash for this purchase was borrowed from the International Paper Company, a corporation of New York, on the joint note for $50,000 of the appellees Miller, Weil and McFarland payable in annual installments of $10,000 with semi-annual interest of 6% and collateraled by $10,000 par value of the fifteen year six percent secured gold notes due in 1943 of the Federated and the voting trust certificates representing the 32,822 shares of stock and an assignment of all dividends.

Subsequently the paper company waived its lien on the dividends until the note due the Fort Investment Company was paid. The Federated notes pledged as collateral were the property of the appellees Miller and Weil. Four Thousand Dollars par value of them were acquired from the Federated on December 31, 1933, for $1,010.

All of the subsidiary corporations of the Federated acquired their paper print stock from the International both before and after the loan. Their purchases averaged $195,000 for the years 1932 to and including 1935. Weil personally negotiated the loan from the International Paper Company. He had previously attempted to borrow the money from a bank, but because of the duration of the loan, it was not bankable paper. He was

the publisher of the Port Huron Times Herald and his net worth was between $300,000 and $400,000 and for thirty years had purchased all of his newsprint paper from International.

Thomas J. White, General Manager of Hearst Publications, introduced Weil to William J. Hurlbut, Vice President of International who arranged the loan with his company, after he had obtained a fianancial statement of the Federated and its subsidiaries and also its earning experience. Hurlbut testified this was not an unusual loan for his company and he felt sure they would get the money back from Weil and his associates. He said the business of the International was not increased by the transaction but that it was a good will loan and made on that basis and expectation.

The two dividends on the stock approximately paid the full purchase price of the voting trust certificates. On July 20, 1934, $1,500 interest was paid by the Federated to the International and a charge of $500 was made on its books against Miller, Weil and McFarland which was repaid by each of them in March, 1936.

McFarland in May, 1932, purchased voting trust certificates representing 750 shares of the common stock of the Federated at $1.33 per share and borrowed the money from it on an open account which he later repaid with a loan from Miller.

On March 4, 1935, Miller, Weil and McFarland entered into a written agreement apportioning to each of them one-fifth of the cost and one-fifth of the voting trust certificates representing the 49,318 shares of stock.

As a part of the agreement, Miller and Weil were to have returned to each of them the $5,000 par value of Federated bonds they had deposited with the International Paper Company. The remaining two-fifths of the certificates were divided equally between Louis A. Weil, Jr., Manager of the Herald Publishing Company, Grand Rapids, Michigan, and Robert B. Miller, Manager of the Enquirer News Company of Battle Creek, Michigan, sons of Louis Weil, Sr., and Albert L. Miller respectively.

The parties also agreed that no one of them, his heirs, administrators, executors, trustees or assigns, would sell any part of his stock even though he had an offer without first giving to all the signers of the agreement jointly a sixty-day option to buy at the offered price and submitting to them his affidavit of the bid price. If not jointly accepted, any one could purchase at the offered price. Upon failure of acceptance of the signatories, the stock could be sold the public.

On the same date all of the parties agreed in writing to make Albert L. Miller, Louis A. Weil and Stanley W. McFarland their irrevocable proxies for the voting of said stock for all purposes for a period of ten years thereafter and in the event of the death of Miller, his son, Robert A. Miller, was named as his successor, of Weil, his son, Louis A. Weil, Jr., and of McFarland, his wife, Gertrude McFarland. The proxies were prohibited from voting any part of the stock to effect a merger, consolidation or partnership with any other firm, person or corporation and from voting any part of said stock to amend the charter or by-laws of the corporation for the purpose of changing the number of directors.

As of December 31, 1933, the Federated had outstanding $2,300,000 six percent gold notes, interest payable in semi-annual installments of $69,000 due May 1 and November 1, and in addition thereto the Federated was required to pay into the sinking fund for the retirement of the notes on or before February 15, each year $50,000 in cash or notes and ten percent of the net earnings of its subsidiaries. The company also agreed that so long as any of its secured notes were outstanding it and its subsidiaries would not create any indebtedness unless its and subsidiaries' consolidated net income for the twelve months ending ninety days prior to the creation of the debt, including reasonable depreciation, equalled two and one-half times the interest requirements on the outstanding notes and all other company indebtedness, including the one to be created.

Under the trust indenture no dividends were to be declared or paid on its common stock so long as its notes were outstanding unless the consolidated current assets of the company and its subsidiaries, after payment of dividends, equalled at least twice the consolidated current liabilities of the company and its subsidiaries. The Federated defaulted in both interest and sinking fund payments for 1933, and on April 10, 1933, the company proposed to

the holders of its notes that they deposit them with the Old-Merchants National Bank & Trust Company, Battle Creek, Michigan, not later than June 13, 1933, and in the event 76% or more of such notes were presented, two-thirds of the coupon interest due May 1, 1933, would be paid. The remaining interest due was to be paid out of net earnings at the discretion of the Board and the fixed annual sinking fund requirement of $50,000 was to be waived, but the payment of ten percent of the net earnings was to be retained and no dividends to be paid on the common stock until all interest was made current and $50,000 par value of the notes retired annually. Eighty-nine and three-tenths percent of the notes were deposited in accordance with the proposal and on or before November 28, 1933, owners representing this percentage had accepted the proposed plan of refinancing and the trust indenture modified accordingly.

On March 7, 1934, the Union Guardian Trust Company, trustee under the original trust indenture, declared a default and demanded that the money or notes required under the sinking fund be deposited. On November 22, 1934, the Federated fully complied with the terms of the original trust indenture insofar as it affected the nonconsenting noteholders.

In 1933, after Federated defaulted in payment of interest on its notes, it bought $48,000 par value thereof for $18,240 and in 1934 it bought $170,000 par value for $85,000. The Federated and affiliates for 1928 to and including 1931 earned all interest charges on its notes, all sinking fund requirements on its trust indentures and increased its earned surplus. In 1932, it had a net loss after all charges of $72,890.40. In 1933, it had a net income of $8,373.89. In 1934, it had a consolidated net income of $130,060.95 and in 1935, $414,674.31. On December 31, 1933, it had current consolidated assets of cash $128,-280.43; notes and accounts receivable $117,026.34; inventories $36,070.25; prepaid expenses $38,168.19, a total of $294,-545.21. It owed in current liabilities accounts payable $43,608.42, accrued pay roll current interest and taxes $49,091.76, a total of $92,070.18. It had $54,255.03 of deferred assets made up of postal deposits, impounded bank balances and advances and owed on prepaid subscriptions $16,-919.01. It had fixed assets of $2,751,876.69 and deferred charges on note discount and

expense of $126,105.23. It had long term liabilities of $2,265,000 and deferred interest charges on notes to be paid out of income at the discretion of its Board of Directors of $90,760 and owed a balance on buildings and taxes for street improvements of $170,534.84. It had theretofore written its no par stock down to $107,990. It had an earned surplus of $98,893.13 and a paid-in surplus of $383,995. Excluding the stock subsequently acquired by the appellees, it had twenty-one stockholders holding more than 500 shares, or a total of 30,425.

Appellee George D. Smith was a director of the Federated and owned 1,000 shares and on February 25, 1933, suggested to Miller, president of Federated and general manager of its subsidiaries, that it would be a good policy for the company to buy some of its common stock in the hands of closed banks at from $1 to $2 a share and also proposed to join Miller and Weil in any purchase they made of the stock on their own account.

On June 15, 1934, the Lansing State Journal Company loaned to Louis A. Weil, Sr., $7,500 amply secured which was repaid in full with interest August 29, 1936.

Appellee Martin was manager and publisher of the Lansing State Journal and between December 31, 1932, and December 31, 1934, it loaned to him $9,600 for the purpose of buying a house. The greater part of the loan was made in 1934 and was amply secured and is being repaid $75 per month. These two transactions were complained of in the lower court but abandoned here; however, appellants rely on them as of evidential value that the Federated was in financial condition to purchase the trustee certificates which the appellees acquired.

On the foregoing facts which are not in dispute the appellants charge that the appellees Albert L. Miller, Louis A. Weil, Sr., and S. W. McFarland violated in two particulars their fiduciary duty to the Federated of which they were directors; first, that they purchased trustee certificates for themselves which it was their duty to acquire for the corporation; second, that they used the funds and good will of the corporation to acquire 33,572 shares of stock for themselves.

■ The first issue is whether these purchases of certificates were of such character that the purchasers should be regarded as trustees for the corporation

and be required to transfer and deliver the stock to it. Ordinarily a director may deal in the securities of his corporation without subjecting himself to any liability to account, for the corporation as such has no interest in its outstanding stock or dealings in its shares among its stockholders. Bisbee v. Midland Linseed Products Company, 8 Cir., 19 F.2d 24; Dupont v. Dupont, 3 Cir., 256 F. 129. It follows from this principle, appellants had the right to buy for themselves unless the circumstances imposed upon them a duty to act for the corporation.

Section 19 of the General Corporation Act of Delaware (Rev.Code 1935, § 2051) expressly confers on a corporation the power to purchase its own stock provided it can do so without impairing its capital.

Capital impairment as here used means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the capital stock of the company. In other words a corporation under the Delaware Statute may use only its surplus for the purchase of shares of its capital stock. Capital does not in this connection mean the assets of the company for of course the assets are reduced when any of it is used by a corporation to purchase shares of its capital stock. It means that the funds and property of the company shall not be used for the purchase of shares of its capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock outstanding. In re International Radiator Company, 10 Del. ch. 358, 92 A. 255.

The question of whether a Delaware corporation shall purchase its capital stock is left to the discretion of its Board of Directors and courts will not interfere with such intra vires transactions, unless there is misconduct on the part of the Board of Directors equivalent to a breach of trust or the Director stands in a dual relationship which prevents an unprejudiced exercise of judgment. United Milk Products Corporation v. Lovell, 6 Cir., 75 F.2d 923.

Evils may flow from a corporation dealing in its own shares not inherent in ordinary business transactions. Such practice tends to encourage breaches of duty on the part of corporate directors or fraud or market rigging and no court of equity should interfere with the act of corporate officers in failing to buy its corporate shares except on a showing of plainest abuse of discretion and positive damage to the corporation or its remaining stockholders.

During the years 1932 and 1933, the subsidiaries of the Federated were suffering a sharp decline in advertising revenues. The parent company was unable to meet its current interest and sinking fund obligations on its gold notes and only by the strictest economies rigidly practiced by its corporate officers was it able to avoid a financial debacle. A corporation is without authority to purchase its shares if creditors are injuriously affected. In order to purchase the stock on its own account the Federated would have been required to exhaust practically all of its liquid assets. It would have been improvident for the directors to use the company's cash for such a purpose under all the circumstances.

Upon the entire case we find no dereliction of duty on the part of the directors that would justify a court of equity substituting its judgment for that of the corporate officers. It therefore follows insofar as the purchase of the 15,746 voting trust certificates from the Fort Investment Company is concerned that appellants were entitled to no relief.

The acquisition of the 32,822 shares of stock from the Guardian National Bank and the 750 shares purchased by McFarland are controlled by a different principle of equity. As to these, McFarland procured the money for his purchase of the 750 shares from the company and the directors procured the money for the purchase of the 32,822 shares from the largest seller of news print to the subsidiary corporations and paid for them out of dividends.

Two inferences may be fairly drawn from the evidence as to the motive of the International Paper Company in making the loan; one, that it was made solely on the credit of Weil; the other, because of the commercial transactions theretofore had between the paper company and the Federated and its subsidiaries with the hope of its continuance.

A director of a corporation occupies a fiduciary relation to it and its stockholders. His position is one of trust and he is frequently denominated a trustee and so

held accountable in equity. The ordinary trust relationship of directors of a corporation and stockholders is not a matter of statutory or technical law. It springs from the fact that directors have the control and guidance of corporate business affairs and property and hence of the property interests of the stockholders. Equity recognizes that stockholders are the proprietors of the corporate interest and are ultimately the only beneficiaries thereof. Those interests are in virtue of the law intrusted through the corporation to the directors and from that condition arises the trusteeship of the directors with the concomitant fiduciary relationship.

It may not be wrong for a trustee to deal for his personal benefit with a trust estate under his control if he does so in good faith and on terms manifestly advantageous to the persons in whose interest he holds it, but it is contrary to wise public policy that such dealings should be allowed because a trustee under such circumstances would have too many opportunities for unfair practices. The law, under no circumstances, will hold valid the dealings in a trust estate by the trustee for his personal benefit. Such transactions, however good the faith in which made, are malum in se.

If two inferences may be drawn from the conduct of the directors in procuring for themselves the voting trust certificates, one without damage to the Federated and the other with it, the latter, rather than the former, will be drawn, because of the relationship of the parties.

The growth of corporations and the disappearance of the individual and partnership forms of business have become so extensive and vital in our economic life, and so many artificial legal devices have been set up which serve to isolate the stockholder from control over his investment that directors and other officers of a corporation should be held to a strict accountability for their acts in its management.

It is too plain for citation of authority that a director of a corporation cannot barter or sell his official discretion or enter into any contract whatever that will in any way restrict or limit the free exercise of his judgment and discretion in his official capacity, nor can he place himself under any direct and powerful inducement to disregard his duty to the corporation and its stockholders in the management of corporate affairs. Compare Holland Furniture Company v. Knooihuizen, 197 Mich. 241, 163 N.W. 884; Dunnett v. Arn, 10 Cir., 71 F.2d 912; Germania Safety-Vault & Trust Company v. Boynton, 6 Cir., 71 F. 797; McMillan v. National Wool Warehouse & Storage Company, 9 Cir., 28 F.2d 793; Wagner Electric Corporation v. Hydraulic Brake Company, 269 Mich. 560, 257 N.W. 884; Thomas v. Matthews, 94 Ohio St. 32, 113 N.E. 669, L.R.A.1917A, 1068; Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121; Trice v. Comstock, 8 Cir., 121 F. 620, 61 L.R.A. 178; McCourt v. Singers-Bigger, 8 Cir., 145 F. 103, 7 Ann.Cas. 287.

The note executed to the International Paper Company was for seven years and at six percent and no installment was due on it until three years; thereafter it was payable at the rate of $10,000 per annum. This was an unusual financial transaction and could have been used by the International Paper Company to coerce the directors of the Federated to continue the purchase of newsprint paper from it, regardless of competitive prices. The directors, in dealing with the Paper Company, placed themselves in a position where there would be a direct and powerful inducement to disregard their fiduciary duties to the Federated and its subsidiaries.

Under such circumstances it would be inequitable and against sound public policy to permit the directors or their participating assignees to profit by this transaction. It therefore follows that the Federated on assuming all obligations attaching to the stock had an election to compel the directors and their assignees to turn over to the corporation all of it they acquired from the Guardian National Bank and under the facts here presented, we believe it to the advantage of the Federated to take the stock.

The purchase by the appellant McFarland of the voting trust certificates representing 750 shares of stock with funds of the corporation is controlled by the same equitable principle applicable to the purchase of the certificates representing the 32,822 shares owned by the Guardian National Bank. It is clearly against public policy for a director to borrow money from the corporation to purchase its outstanding shares and the corporation has an election in such cases to recover the

92

money loaned with interest or the shares acquired.

The decree below is accordingly reversed and the case remanded to the District Court with directions to enter a decree to the effect that the defendants, Albert L. Miller, Louis A. Weil, Sr., S. W. McFarland, Louis A. Weil, Jr., and Robert B. Miller hold the 33,572 shares of stock of the Federated in trust for its sole use and benefit and they shall be directed to transfer said shares to the corporation and said shares shall be freed from the irrevocable proxy of May 4, 1935.

There should be delivered to the appellees, Albert L. Miller and Louis A. Weil, Sr., the $10,000 in Federated gold notes pledged as collateral to the International Paper Company on the $50,000 note and any sum paid by any of the parties out of their own funds for the purchase of the said 33,572 shares shall be repaid them by the Federated, together with six percent interest thereon from date of payment.

Appellants shall recover of the appellees Albert L. Miller, Louis A. Weil, Sr., S. W. McFarland, Louis A. Weil, Jr., and Robert B. Miller, their costs.