## WOLFES et al. v. PARAGON REFINING CO. et al.
### No. 6519.

Circuit Court of Appeals, Sixth Circuit.
Oct. 12, 1934.

Rehearing Denied Jan. 10, 1935.

Murray Seasongood, of Cincinnati, Ohio, and C. A. Quintrell, of Cleveland, Ohio (Paxton & Seasongood, of Cincinnati, Ohio, Baker, Hostetler, Sidlo & Patterson, Arthur C. Denison, and Joseph C. Hostetler, all of

**194**

Cleveland, Ohio, on the brief), for appellants.

P. J. Bickel and H. J. Crawford, both of Cleveland, Ohio, and J. S. Graydon, of Cincinnati, Ohio (Dinsmore, Shohl & Sawyer, of Cincinnati, Ohio, Squire, Sanders & Dempsey, of Cleveland, Ohio, and Charles Sawyer, of Cincinnati, Ohio, on the brief), for appellees.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

HICKS, Circuit Judge.

Bill in equity filed October 24, 1930, by certain class B stockholders of the Paragon Refining Company against it and its board of directors. The bill charged the directors with negligence in the management of the affairs of the company, and particularly complained of the acquisition by the company of certain stock of the Valvoline Oil Company and of the manner in which it was subsequently disposed of. It also prayed for performance by Edward W. Edwards, Paragon's president and a director, of a contract to purchase the Valvoline stock from the company; attacked the validity of back salary payments to Edwards; and sought a general accounting and judgment against the directors in favor of the company for damages resulting from their alleged wrongful actions or failure to act with respect to these matters.

On November 11, 1930, certain other stockholders filed an intervening bill in which they sought an accounting and a judgment for the back salary payments to Edwards; charged the directors with failing promptly to distribute the assets of the company upon dissolution and with unlawful disbursements; and prayed for an allowance for reasonable compensation for solicitors. But in the meantime Edwards had paid for the Valvoline stock, and had repaid the back salary payments after the board had rescinded their allowance, so that these two matters, with the exception of items of interest, were no longer in controversy.

In their joint answer Edward W. Edwards and Howard Edwards, another director, averred that mergers and combinations in the oil industry and powerful competition had injured Paragon, necessitating its sale, and that panicky conditions in the financial and business world had delayed its dissolution. The answer of Paragon and the other respondent-directors, Geier, Crabbs, Omwake, Shepherd, Sawyer, Leroux, and John Edwards in its significant parts was similar

to that of E. W. and Howard Edwards. William Cooper Procter, a director, answered that he had not been a member of the board since March, 1930.

A defense common to all was that Equity Rule 27 had not been complied with, in that facts showing an effort to secure action on the part of the board of directors to correct the alleged wrongs were not set forth with sufficient particularity, and that no explanation was given for the omission.

On June 22, 1932, solicitors for plaintiffs and interveners filed a motion alleging that the filing of the original bill had brought $6,500,000 into the treasury of Paragon and that the complaining stockholders had incurred expenses and counsel fees which had benefited the company; that the cost thereof had been borne by them, and that to this end the court should make an appropriate allowance. The primary contention is over this application. The facts show:

In 1924, E. W. Edwards, a resident of Cincinnati, became president of Paragon, which was operating a crude oil refinery at Toledo and distributing its products in a territory confined largely to Northwestern Ohio and Southeastern Michigan. For a number of years the company had been losing money, but under Edwards' efficient direction its losses had been checked and for the years 1927 and 1928 it had made profits of $360,000 and $760,000, respectively.

Under Edwards, Paragon had pursued a policy of absorbing other oil companies. On August 7, 1929, the board had authorized him to buy the common stock of Valvoline at a sum not to exceed $200 per share. On October 1, 1929, he reported to the board that he had bought 34,000 shares, and to secure the funds to make payment therefor he had given 90-day notes of Paragon to three New York banks for $5,500,000, which notes he had personally indorsed. He then and there suggested to the board that it permanently finance the purchase by a note issue with the privilege of conversion into common stock after three years. An authorization to this effect was voted by the executive committee.

The ultimate obligation of Paragon for the purchase of Valvoline as shown by the balance sheet of December 31, 1929, amounted to $6,400,000 evidenced by notes payable. The condition of Paragon was now unfavorable as compared with December 31, 1928, when the company had current assets of $2,200,000 and current liabilities of but $1,400,000. Moreover, it had, in the spring of 1929,

sold additional shares of class B stock yielding over $2,300,000 in cash. But by the purchase of Valvoline its strong cash position was destroyed, for, though on December 31, 1929, it had current assets of $3,000,000, nearly twice that amount was due ten days later, when the Valvoline notes matured. On that date these notes were renewed for three months. It was about this time that it became apparent that because Valvoline sold a highly specialized line of oil and grease products in a world-wide market, its operations could not be efficiently consolidated with the geographically restricted business of Paragon.

As early as December 9, 1929, Messrs. Hyatt and Hostetler of the law firm of Baker, Hostetler & Sidlo, then representing certain stockholders of Cleveland, who afterward became interveners in this suit, went to Toledo and sought detailed information from Mr. Leroux, a director and secretary-treasurer of Paragon, regarding the Valvoline purchase. These gentlemen also conferred several times during the succeeding January with Howard I. Shepherd, a Paragon director living in Cleveland, regarding the efforts to finance Valvoline. On January 11 they wrote letters to the board inquiring about Paragon's indebtedness and particularly about the notes to the New York banks.

Hyatt testified that he had a conversation with Shepherd on February 18 wherein Shepherd stated that the executive committee of the bank of which he was a vice president (Guardian Trust Company at Cleveland), and which then carried a loan of $350,000 for Paragon, had met with Mr. Inglis, who represented a syndicate of Paragon stockholders, also represented by Hyatt's firm, and discussed Paragon and decided that by a united front they might persuade Edwards to relieve Paragon of Valvoline, since Edwards had exceeded his authority in financing the purchase with short-term notes without first providing for the sale of debentures to cover the obligation.

From Hyatt's statement of a conference with Shepherd and E. W. Edwards on April 2, 1930 (the first time Hyatt and Edwards discussed the matter), it appeared that Edwards had deals pending for the sale of all the Paragon assets to the Pure Oil Company or to the Gulf Company. Edwards then stated that no commitment had been made by either company as to Valvoline and that he had considered taking it over himself but for the fact that should it prove profitable he would be criticized. Hyatt testified that he suggested to Edwards selling Valvoline to the Paragon stockholders with Edwards underwriting the sale. Quoting: "I told Mr. Edwards that our firm represented people who were interested in both classes of the company's stock, that we were much concerned over the investment; that the Valvoline deal seemed to us unwise and unwarranted; that the current borrowing of five and one-half million dollars which it involved, without a complete financing, put the company from a very good financial position, into one where it could not pay its debts."

Hyatt further told Edwards that at a meeting of stockholders, scheduled for the next day, which he would attend on behalf of the stockholders he represented, he could not ratify what had been done nor indorse reelection of the present directorate in view of the Valvoline purchase. Recognizing that an antagonistic position at the stockholders' meeting might embarrass Edwards in his negotiations, Hyatt suggested that the meeting be adjourned for thirty days, without action on these matters, to permit proceeding with the negotiations. The meeting was adjourned to May 6, at which time the directors, however, authorized a renewal for three months of the Valvoline loans.

At a conference on May 2 between Hyatt, E. W. Edwards, Shepherd, and Sawyer, a director and attorney for Paragon, Edwards stated that the Gulf Company was seriously considering buying Paragon, and that he thought the stockholders' meeting should be postponed until May 13.

At this adjourned meeting on May 13 the votes of 27,492 shares, represented by proxies to Hyatt and Shepherd, and Shepherd's own holdings, were cast in opposition to a resolution confirming and ratifying the official acts of the officers and directors during the past year. The resolution carried nevertheless. Hyatt voted his proxies against the proposed slate of directors which was substantially the group that had served the previous year. Shepherd, whose name was in the list, declined to vote. All were elected over this opposition.

On the same date, Hyatt, representing the Guardian Trust Company, Midland Corporation, Otis & Co., Witt-Kraus Company, and John P. Witt, stockholders, submitted a letter to the Paragon board in which he branded the Valvoline stock as being worth far less than was paid for it, charging that the purchase was unauthorized and had no binding effect on Paragon, and declaring that the gross negligence and bad faith of the officers of the company constituted such mis-

management as to put the entire business in jeopardy. The letter demanded that the board rescind the Valvoline transaction and disclaim liability on the notes and in the event of its failure to act, that E. W. Edwards assume the transaction and make the corporation whole in respect thereto. The letter of protest was called to the attention of the board by a telegram of even date from Baker, Hostetler & Sidlo.

The minutes of the directors' meeting of May 16 contain a reference to an offer from the Union Trust Company of Pittsburgh, acting for the Gulf Company, for the purchase of Paragon, and a statement by E. W. Edwards that if it became necessary to dispose of the Valvoline stock as a separate transaction, he would make an offer to the board relative thereto.

Prior to the directors' meeting of May 26, Hyatt met with Shepherd and E. W. Edwards and Edwards stated that he had been embarrassed by Hyatt's attacks and particularly by the protest and asked that it be withdrawn. Hyatt refused to do this unless the ratification also was withdrawn. Hyatt sat in on this meeting of May 26, but action was deferred on the Union Trust offer pending a discussion with the Cleveland stockholders on the next day. This group indorsed the sale to Gulf upon the understanding that E. W. Edwards make a definite contract to take Valvoline at the price it had cost Paragon.

On the following day Edwards' offer, in which he agreed to take 32,228 shares of Valvoline for $6,437,157, subject to concurrent delivery of the stock certificate and payment by the Union Trust Company for the other assets of Paragon, was presented to the board. The offer was drawn to permit participation in the purchase by other Paragon stockholders if they wished. Edwards' offer and that of the Trust Company were accepted subject to the approval of the class B stock and a resolution was adopted commending him for his splendid part in taking over the Valvoline stock. A meeting of stockholders was called for June 24 which ratified the Union Trust Company offer of $10,000,000 subject to certain adjustments to be made before September 12.

Gulf, the nominee of the Trust Company, having substantially completed its contract on September 3, payment by Edwards was then due.

The facts thus far, which, we have stated with some detail because of the importance attached thereto by counsel, reveal that the Valvoline acquisition was ill-starred; that a minority of stockholders of Paragon through their counsel vigorously complained; and that E. W. Edwards, with a sense of personal responsibility, contracted to purchase Valvoline. But the facts do not indicate that at any time up to September 3 Edwards had considered breaching his contract nor that the board had either affirmatively or by inaction connived in any such intention. Any such inference, if drawn, must be deduced from the following subsequent events:

Edwards did not pay on September 3. Leroux knew at once that he had failed to pay. Shepherd was advised of it by Edwards himself on September 15. Sawyer learned of it on September 29 and Crabbs on October 9.

A directors' meeting was held on September 15 to call a stockholders' meeting for September 29 to consider the dissolution of Paragon, but Edwards' default was not discussed. The meeting, on the other hand, voted back salary to Edwards under the following circumstances:

From 1924 to 1928, he, a man of wealth and large business interests, had acted without compensation. In 1929 and 1930 he had, without protest, drawn a salary of $25,000 per year as president of Paragon. The motion made by Shepherd, seconded by Crabbs and carried, was to pay Edwards a sum equal to the amount he would have drawn had he been paid the salary from the time of his first election as president. This amounted to $112,500. On the following day Shepherd discussed this salary payment with attorneys in Cleveland, who advised that it was illegal in view of the impending dissolution of the company, and on September 17 he addressed a letter to Edwards expressing his doubts and suggesting that the matter should be reconsidered.

Hyatt, still active, attended the meeting on September 29 at which time the stockholders voted the dissolution of the company and extended the performance date for Edwards' purchase to October 15. This extension was made at the request of Edwards, who stated that he was going to sell Valvoline for a price higher than he had agreed to pay. He had made a similar statement to Shepherd a day or two before. Shepherd and Hyatt, as proxies, did not vote upon the motion extending the performance date because they did not deem themselves empowered by their stockholders to vote on the matter.

At this same meeting Shepherd moved that the back salary action of the September

15 meeting be rescinded, but there was no second to his motion. This move seemed to irritate Edwards and he intimated that if the matter were pressed and there were any legal means by which he could get out of his Valvoline contract he might resort to them.

On October 14, 1930, a suit was brought by William R. Collins, a purported stockholder, against Paragon, asking an injunction against the sale of Valvoline to Edwards. This suit was without merit. Plaintiffs charged that it was collusive as between Collins and Edwards. There are circumstances which give color to this charge, but there is no evidence that any of the directors had any knowledge of the suit until after it was brought. On the next day, in view of the Collins suit, the firm of Baker, Hostetler & Sidlo sent a telegram to the Paragon board insisting that the company proceed immediately to enforce the sale to Edwards, since it had been properly authorized by the board and the stockholders. On the same day the firm likewise sent identical telegrams to individual members of the board.

In the meantime, beginning June 13, 1930, an extended exchange of letters and telegrams took place between E. H. Wolfes, a stockholder (one of the plaintiffs), and E. W. Edwards and other officers of the company relative to payment of dividends on class B stock. This correspondence was concluded, when, on October 11, 1930, Edwards wired Wolfes that a dividend which had several times been deferred would be further postponed pending a directors' meeting in a week or ten days.

On October 14, in anticipation of Edwards' failure to pay the next day, plaintiffs Wolfes, and Seasongood and Haas, stockholders, employed Mr. Murray Seasongood to represent their interests. Mr. Seasongood immediately endeavored to reach Edwards, but could not locate him. He did get in touch with Sawyer upon the morning of October 15 and inquired of him as to the reasons for failure to pay dividends. He also discussed the Collins suit and told Sawyer that he thought it was fictitious and should be promptly gotten rid of.

Earlier in the morning Sawyer had learned of the Collins suit and immediately undertook to communicate with Edwards, who could not be located. It developed that he was then in Pittsburgh or New York trying to borrow money with which to discharge his contract. Sawyer phoned the other directors, with the exception of John Edwards, and advised them of the serious nature of the Collins suit. He also suggested that Leroux call a directors' meeting immediately. Leroux responded that the call should be made by the president, but that the president having already authorized it, he would call a meeting for October 21. At this meeting on the 21st, E. W. Edwards called attention to the Collins suit and stated that it was a cloud upon his title to the Valvoline stock, and that from then on he wanted to take counsel in everything that he said or did. His counsel stated that he was present to acquire information so that he might know how to advise Edwards. At this meeting the board voted to employ Sawyer's firm, Dinsmore, Shohl & Sawyer, to defend the Collins suit. It also voted to tender the Valvoline stock to Edwards.

Criticism is directed against Sawyer because he seemed to hesitate to bring suit against Edwards. It is apparent that he did not welcome employment against Edwards because they were not only friends, but had been closely associated in business; however, the weight of the evidence is that his attitude was that action should at once be taken against Edwards, and that he would not remain on the board unless this was done. At this meeting Sawyer asked Edwards whether he was prepared to go through with his contract, to which Edwards responded, upon the advice of his counsel, that he would rather not answer that question.

On the afternoon of the 21st there was an informal discussion among the directors at Sawyer's office in which Hostetler and Hyatt took part. These gentlemen contributed suggestions for a draft of the tender to be made to Edwards and were then assured by Sawyer that all steps necessary to enforce the collection from Edwards would be taken. At that meeting it was the sense of the directors that another formal meeting should be held to authorize suit against Edwards in case the tender was declined. This meeting was called by Edwards himself for Saturday, October 25.

On the same afternoon, Hostetler, Hyatt, and Seasongood met Sawyer and Geiger at Sawyer's office, and Seasongood stated to them that in his opinion they were negligent and personally liable; that they should "make Edwards come through with this proposition." He also denounced the back salary resolution as illegal.

As indicated, Crabbs, at the request of Edwards, was with him in Pittsburgh on October 14 in an effort to secure funds with which to fulfill his contract. They failed because the bankers asked for more collat-

eral than had been previously agreed upon, so Edwards went from Pittsburgh to New York. The inference is that he went there for the same purpose and again failed. Crabbs, in company with Procter, who was not then a director but was a man of large business affairs, had an interview with Edwards on the afternoon of Friday, October 24. From that interview it became evident to Crabbs that Edwards' delay was due to his inability to raise the money, and he testified that in thinking over the matter that night he devised a scheme which he thought would enable Edwards to perform. Early on the morning of the 25th he arranged a meeting with Edwards and his counsel. He then stated to them: "Gentlemen, on the assumption that Mr. Edwards' desire is to go through with this contract, I believe I have found a solution." Edwards responded, "That is my desire." Crabbs detailed his proposition substantially as it was afterward adopted by the board. Edwards replied that he would accept it if the board would agree to it, and further stated to Crabbs, "Now to show you that I am anxious to fulfill this contract and if the board will accept the proposed suggestion of yours and you will go with me to New York next week I will undertake to raise the money to pay the obligation in full."

Crabbs went immediately to Sawyer's office where the directors were in session and reported the proposal and Edwards' acceptance of it. After some discussion it was dictated to a stenographer by Sawyer, Edwards was telephoned, and he came over and signed it, leaving immediately. This proposition is printed in full.[1]

At the same meeting the board rescinded the resolution of September 15 allowing the back salary of Edwards. Just before the meeting adjourned Sawyer was called out of the office and was served with a copy of the bill of complaint in the present suit. He returned to the meeting and reported that they had all been sued.

Of the directors present at this meeting the following testified: Sawyer, Shepherd, Crabbs, Omwake, and Leroux. Each stated that Sawyer's announcement was the first knowledge or information they had of the suit. Geier was overseas when the case was tried.

The directors remained in almost constant session, during business hours, until October 28, when they received word that Edwards, who had gone to New York on October 26 with Crabbs, had obtained the entire amount of his contract and paid it to Leroux with interest at 5 per cent. from September 3.

Assuming, as did the District Judge, without deciding, that Equity Rule 27 was complied with, we fail to find any error in the decree dismissing the bill.

---

[1] "Cincinnati, Oct. 25, 1930.

"To the Board of Directors of The Paragon Refining Company.

"Gentlemen: In view of present conditions I am not able to pay today in full my obligation to purchase according to the terms of the contract of May 28, 1930, the shares of common stock of The Valvoline Oil Company, certificates for which shares you tendered to me yesterday, accompanied by a letter demanding payment in accordance with the terms of my contract of May 28, 1930, and I ask you to consider the following proposal:

"(1) I will, on or before October 30, 1930, accept the certificates of stock of The Valvoline Oil Company above referred to, and which were tendered to me yesterday and on or before that date, in payment therefore, will deliver to you the following:

"(a) One Million ($1,000,000.00) dollars in cash.

"(b) My note in the sum of five million, four hundred and eighty-four thousand eighty-six dollars and sixteen cents ($5,-484,086.16), said note to be payable on or before one (1) year after October 30, and to bear interest from that date at the rate of five (5%) per cent per annum, said note representing the balance of the full purchase price originally agreed to be paid by me with interest at five (5%) per cent, after the deduction of $1,000,000.00 to be paid in cash.

"(c) Seventy-five thousand (75,000) shares of common stock of The Columbia Gas & Electric Company, a Delaware corporation.

"(d) All of the certificates for shares of The Valvoline Oil Company purchased by me from The Paragon Refining Company.

"Said shares of Columbia Gas stock and Valvoline Oil Company stock are to be held by The Paragon Refining Company as collateral for the payment of said note, dated October 30, 1930, and are to be redelivered to me upon the payment of said note, with interest.

"I shall make every effort to anticipate payment of the note and to carry out the terms of my contract with The Paragon Refining Company at the earliest possible date.

"Signed: E. W. Edwards."

The chief assignments of error challenge the findings that the activities of plaintiffs and their counsel were not the procuring cause in obtaining the restoration of the Edwards' debt to Paragon; that the directors were not neglectful of their duties in connection with the Valvoline and bonus issues; that 6 per cent. instead of 5 per cent. interest need not be charged to Edwards on his obligations; and that plaintiffs failed to make a clear and satisfactory showing that they were entitled to an allowance for attorneys' fees.

■ It is clear that plaintiffs are not entitled to an allowance for services rendered by their attorneys prior to the preparation and filing of the bill. Up to that time the attorneys were representing individual stockholders. But the rationale of a bill such as this is that, while it is brought in the names of individual stockholders, it is, in effect, on behalf of the corporation. See Equity Rule 27 (28 USCA § 723); also Wathen v. Jackson Oil & Refining Co., 235 U. S. 635, 639, 35 S. Ct. 225, 59 L. Ed. 395; Continental Securities Co. v. Belmont, 206 N. Y. 7, 99 N. E. 138, 51 L. R. A. (N. S.) 112, Ann. Cas. 1914A, 777. Where it results in the recovery of a fund in peril the proceeds then belong to the corporation, and attorneys, who have contributed to the result, are entitled to a lien upon and an allowance out of the aggregate recovery. But such a bill is maintainable only where it is necessary to prevent a loss of corporate assets due to the wrongful actions and conduct of the board of directors and where the board itself had refused to institute the suit. It is elementary that so long as the board acts in good faith and in the exercise of its discretion and for what it deems to be the best interests of the company a court of equity will not interfere at the instance of minority stockholders.

■ We do not think that the board should have been expected to sue Edwards immediately upon his default. It then had a legal right to sue, but a law suit is not always advisable even upon an undisputed claim. It is not difficult to foresee that such a suit for so large an amount might have resulted in greater harm than benefit. While Edwards' statements on two or three occasions as to his intention were somewhat equivocal, he at no time repudiated the contract, and his request for an extension was a confirmation of it.

■ Finally, the evidence tending to show that plaintiffs' suit was the producing or motivating cause of the settlement is not satisfactory. Some of the circumstances herein detailed tend to show that it was; but, giving due consideration to the positive testimony of Sawyer, Shepherd, Crabbs, Omwake, and Leroux, we are brought to the conclusion that payment by Edwards was brought about by the industry of Crabbs after he had learned on October 9 that Edwards was having financial difficulties and that the settlement was achieved before these directors had any knowledge or information that the suit had been brought. The same may be said with reference to the rescission of the back salary payments. It was Shepherd, and not plaintiffs, who first challenged their validity after he had taken the advice of counsel, and, though he was not successful in obtaining action at the first board meeting after it was voted, at the second he was. The directors were all successful business and professional men. They were stockholders themselves, with financial interests identical with those of plaintiffs, and while some of them were friendly to Edwards, due to business relationship, there is no substantial evidence that they were dominated by him.

■ As to the interest items, whether to charge Edwards with interest upon the bonus payments or with 6 per cent. rather than 5 per cent. upon the delayed payments of his contract was purely within the discretion of the board, and it should not be regarded as unreasonable to sacrifice a few thousand if by so doing it expedited the immediate receipt of millions in a time of general financial distress.

The decree of the District Court is affirmed.