# E. N. NELSON AND OTHERS v. NORTHLAND LIFE INSURANCE COMPANY AND OTHERS.[1]

April 17, 1936.

No. 30,798.

[1]Reported in 266 N. W. 857.

John B. Richards, for appellants.
Oscar Hallam, for respondents.

JULIUS J. OLSON, JUSTICE.

Plaintiffs, owners of 83 shares of stock in Northland Life Insurance Company and claiming to represent other minority stockholders' interests, appeal from a judgment entered pursuant to findings and order for judgment dismissing their complaint on the merits and awarding defendants costs and disbursements.

The two corporate defendants, both domestic stock companies, as indicated by their respective names, are engaged in the life insurance business in this and other states. We shall hereafter refer to these companies as the Northland and the Modern Life.

Defendant Lundgren was the owner and holder of the largest amount of the capital stock of the Northland, also a member of its board of directors, at the time the basis for the present cause is claimed to have its origin.

Northland was organized in 1916. Its authorized capital was $125,000 divided into shares of the par value of $10. Its issued and paid-up capital October 10, 1933, was only $15,130, representing 1,513 shares. At that time the outstanding policies numbered 1,169 and the insurance in force $227,459.47. Its total assets were $20,943.37, that sum also including $2,209.33 of "nonadmitted assets." Its liabilities to general creditors were $6,210.77, of which $3,992.91 represented advancements or voluntary loans made by some of the stockholders to replenish a depleted reserve. As between such stockholders and the policyholders, the advancements or loans were by agreement made inferior to policyholders' rights. But in event of liquidation of the company these sums were to be paid to the contributors before distribution of assets should be made to stockholders generally. The necessary policy reserve was approx-

imately $7,754.65. Its capital had been and then was substantially impaired.

The regular annual meeting of the company was held February 7, 1933, but adjournments were taken from time to time, each being duly noted in its records, until September 6, 1933, at which time 557 shares were "present in person" and 548.75 shares were "present by proxy," a total of 1,105.75 shares. At that meeting the following resolution was adopted (the record vote was 776.25 for adoption and 329.5 against) :

"WHEREAS, it is for the best interests of the Stockholders of the Northland Life Insurance Company, and of all persons concerned in said corporation that the said Northland Life Insurance Company be dissolved, the Board of Directors of said corporation are hereby authorized to cause appropriate action to be taken to effect such dissolution if such action shall be deemed advisable."

Also at this meeting a motion was made and carried that an adjournment be had until October 10, 1933, at four o'clock in the afternoon.

The adjourned meeting of October 10, 1933, is the one concerning which plaintiffs complain most bitterly. At that meeting 782 shares were "present in person" and five "present by proxy," in all 787. At this meeting article three of the certificate of incorporation was amended so as to read as follows: "The principal place of transacting business of said corporation shall be in the City of St. Paul, Ramsey County, Minnesota." Formerly that section had provided for Duluth as its principal place of business. That resolution was carried unanimously. A further resolution was introduced and likewise unanimously passed that the president and secretary "be and are authorized and directed to execute and acknowledge a Certificate under the corporate seal of the Corporation embracing the foregoing resolution, and cause said Certificate to be filed, recorded and published in the manner required by law." In conformity therewith said officers duly executed, published, recorded, and filed such amendment. On the same day, after the adoption of the resolutions mentioned, defendant Lundgren and his

associates transferred their stock in the Northland to Modern Life, that is to say, 782 shares. (Eighty shares of the stock so transferred were to persons representing the company, Nation, Jorgenson, Hallam, and Kuefner, 20 shares to each.) Three of the then directors of the Northland, having joined Mr. Lundgren in making these transfers, resigned as such, and the four persons representing Modern Life were elected to take their places, plaintiff Nissen being the only director who had not so disposed of his stock. Immediately thereafter all of Northland's assets, books, records, and papers were removed from Duluth to St. Paul, where its business has since been conducted.

At the appropriate time for the 1934 annual meeting, notice having been duly published and served, the stockholders held their regular annual meeting at the company's office in St. Paul. There were 782 shares represented in person and 191.5 by proxy, in all 973.5 shares. At this meeting a motion was made and unanimously carried that the adjourned stockholders' meeting of October 10, 1933, and "all action taken at said meeting be hereby ratified and confirmed." Also, a new board of directors was elected except plaintiff Nissen, whose term had not expired.

Later, on the same day, the directors met and elected new officers, all of whom promptly qualified.

■ Plaintiffs seek to set aside the sale of the stock in the Northland made by Lundgren and his associates to Modern Life and its representatives, claiming that such conduct on their part results in perpetrating a great wrong upon them; that the latter company is thereby able to assimilate and will ultimately destroy the Northland. But plaintiffs' charges of fraud, deceit, and overreaching were met by adverse findings on the part of the court, as well they might, because a finding the other way could not be sustained upon the present record.

When holders of the majority stock concluded to wind up the affairs of the Northland it is obvious that they had virtually given up hope of salvaging the company as a going concern. For that reason they invested their board of directors with plenary authority to proceed to wind up its affairs. The directors, representing as

they should and did all stockholders as a body, naturally had the preservation of all these holdings in mind. For the advantage of all stockholders it is not surprising that they sought ways and means of getting the most possible out of what must have appeared to them a hopeless enterprise. They accordingly entered into negotiations with the officers of the Modern Life and succeeded in entering into a contract with it to the effect that the latter should pay the stockholders of the Northland at the rate of $7.75 per share. It was upon this basis that the majority stock ownership was transferred to Modern Life. That the majority stockholders fairly treated the minority is proved conclusively by the fact that in the contract provision was made whereby the minority stockholders might, if so disposed, come in with the majority upon the same basis. Ample time was given them for this purpose. They, however, have chosen to fight rather than join the majority. Amongst other things they are now asking that if the sale of the majority interests cannot be set aside Modern Life be compelled to pay "into the treasury of the Northland Life Insurance Company $12.25 per share" upon the stock so acquired.

The court found, and this the evidence amply sustains, that the liquidating value of the Northland was only $3.15 per share. This being so, how plaintiffs can hope to succeed must be and remain an unsolved mystery.

We know of no rule of law or logic preventing a stockholder from transferring his interest (i. e., his stock) to another, and counsel's research evidently has been barren of results as no case is cited to sustain any such rule. A share of stock of the type here involved is, as the name imports, a "share" or fractional "interest" in the corporate enterprise issuing it. In this form the owner's interest may be and frequently is traded and exchanged. There is no prohibition against such sale in its articles of incorporation or by-laws. The fact that some of these owners were directors at time of sale does not import fraud or improper conduct. Their stock was their own property. Obviously, it was for such owners to do therewith as their interests dictated, absent fraud and deceit.

"The weight of authority  *  *  *  is to the effect that a director or officer does not stand in a fiduciary relation to a stockholder in respect to his stock, and has the same right as any other stockholder to buy stock from or sell stock to another stockholder." Seitz v. Frey, 152 Minn. 170, 174, 188 N. W. 266, 268; Rogers v. Drewry, 196 Minn. 16, 264 N. W. 225, 227.

Upon what theory Modern Life can be made to pay $12.25 per share into the Northland treasury is not disclosed. No court could control the prices at which the Northland stockholders should sell their stock. That obviously was a matter of private contract between the parties thereto. As to such arrangement the minority interests cannot be heard to complain, absent, as we have said, fraud, overreaching, or deceit.

■ Plaintiffs assert that what took place at the October 10 adjourned meeting is a nullity; hence the amendment of the articles and by-laws of the Northland are wholly void and of no effect. The alleged basis for this attack is that the various adjournments taken from the February general meeting until October 10 were without effect because no notice of the respective adjournments had been given to stockholders and no information given them that the place of business of the corporation was to be changed from Duluth to St. Paul.

Important, if not controlling, is the fact that every such adjournment was taken by Nissen, president, and McFarlane, acting secretary of the Northland. These meetings were had and adjournments taken in Nissen's office, the only office of the company. The vitally important meeting is that of September 6. Plaintiff Nissen presided at that meeting, and McFarlane recorded the proceedings as assistant secretary. Nissen represented 272.25 shares by proxy and his own 28 shares. McFarlane represented 29.25 shares by proxy. The total vote against the resolution to liquidate was 329.5 shares, obviously the shares represented by Nissen and McFarlane. How, then, can these men or those whom they represent truthfully say that the October meeting was without adequate notice to them?

By 2 Mason Minn. St. 1927, § 7472, it is provided:

"The certificate of incorporation of any corporation * * * may be amended so as to change its corporate name, or so as to increase or decrease its capital stock, or so as to change the number and par value of the shares of its capital stock, *or in respect of any other matter which an original certificate of a corporation of the same kind might lawfully have contained,* by the adoption of a resolution specifying the proposed amendment, at a regular meeting or at a special meeting called for that expressly stated purpose, * * *." (Italics ours.)

That the stockholders' meeting in February was in all respects regular and valid is not questioned. It is generally conceded that such meetings may be adjourned from time to time. "An adjourned meeting is but a continuation of the original meeting. * * * The stockholders or members present may transact, at the adjourned meeting, any business which might have been transacted at the meeting as called, * * *." 5 Fletcher, Cyc. Corp. p. 77, § 2015; 3 Cook, Corp. (8 ed.) p. 2102, § 601; In re Hammond (D. C.) 139 F. 898, 901; Synnott v. Cumberland Bldg. Loan Assn. (C. C. A.) 117 F. 379; Western Imp. Co. v. Des Moines Nat. Bank, 103 Iowa, 455, 72 N. W. 657; State ex rel. Ryan v. Cronan, 23 Nev. 437, 49 P. 41; Clark v. Wild, 85 Vt. 212, 81 A. 536, Ann. Cas. 1914C, 661; Mooney v. Farmers M. & E. Co. 138 Minn. 199, 164 N. W. 804. The case of Naftalin v. LaSalle Holding Co. 153 Minn. 482, 486, 190 N. W. 887, relied upon by plaintiffs, is not in conflict with the cited cases. There the adjournment was taken for a special and restricted purpose, "to effectuate" a plan "previously adopted." Naturally and properly the court held that at the adjourned meeting the majority could not rescind and make for naught what had been "previously adopted."

When the resolution of September 6 was adopted by the overwhelming vote of more than 68 per cent of the 1,100 votes present, it is obvious that the majority felt Northland had reached the end of its rope as a going concern. Its cash in bank was *nil*, in fact, was an overdraft. While the company was solvent as to policyholders, the capital of the company was depleted, and this without

reference to the loans or advancements made by the stockholders who had been bearing the brunt of the financial adversities of the company.

Not to be overlooked, in fact we consider this item very important, is the fact that since Modern Life came into control of the affairs of the Northland its financial position has improved. The expense of conducting the business has decreased, its cash and other assets are much improved. Under these circumstances we should not be looking for an opportunity to set at naught that which the majority, in good faith and for the preservation, not only of their own interests but also that of the company, has accomplished.

The lower court found that the amendment to the articles of incorporation and the various amendments to the by-laws were legally and regularly adopted. We find no occasion to differ with the trial court in this respect.

Even if we were to grant all that plaintiffs claim in respect to the alleged defects regarding the October 10 meeting, the fact still remains that the transfer of a majority of the shares to Modern Life cannot, in view of the facts disclosed, be questioned. The new directors elected by the majority were in any event de facto officers. As such their acts would necessarily bind the corporation.

"A person is a de facto officer where he thus acts as such, under color of an election or appointment, although the meeting may have been irregularly called, or held without proper notice, or irregularly conducted; * * *." 2 Fletcher, Cyc. Corp. p. 150, § 376.

"The act of de facto officers of the corporation in calling a meeting will be binding upon it * * *." 14 C. J. p. 888. Simon Borg & Co. v. New Orleans City R. Co. (D. C.) 244 F. 617.

In 7 R. C. L. § 424, p. 436, it is said:

"So in harmony with the general rule governing officers de facto it is an established doctrine that the acts of directors de facto of a corporation are valid as to third persons. *The acts of de facto officers are also binding as between the corporation and its stockholders or members.*" (Italics ours.)

In Simon Borg & Co. v. New Orleans City R. Co. (D. C.) 244 F. 617, 620, the court said:

"Before passing this question, there remains to consider the further contention of plaintiffs that the board of directors and president of the City Company were not qualified officers because they were not owners of sufficient shares of stock in the corporation. * * * The directors and president were officers de facto, if not de jure, and any irregularity of their election would have no effect on the action of the stockholders at the meeting called by them, and otherwise regularly held, especially as plaintiffs had notice of the meeting and were present and participated."

With transfer of majority stock ownership necessarily went control of the corporate enterprise. Clearly, then, the new owners have the same rights as their assignors. If the original owners had proceeded as have the new it is not likely that anyone would have thought of questioning the result.

At any rate, what was done in October, 1933, has now become moot because at the 1934 annual meeting of the Northland 973.5 shares in person and by proxy elected by unanimous vote a new set of four directors (the fifth is Mr. Nissen, whose term has not expired) and a new set of officers. A resolution was there duly adopted approving all that had been done at the October, 1933, meeting. We have examined the record respecting the notice of this meeting (February, 1934) and find nothing faulty in form, substance, or adequacy of service thereof.

Many other errors have been assigned by plaintiffs and discussed in briefs of counsel. We deem it unnecessary to consider these, as the pivotal issues hereinbefore determined are decisive of the ultimate result.

The judgment is affirmed.