**SEAGRAVE CORP. v. MOUNT et al.**

**SPAIN et al. v. MOUNT et al.**

**Nos. 11914, 11915.**

United States Court of Appeals,
Sixth Circuit.

April 23, 1954.

Walter M. Shohl, Cincinnati, Ohio (Allen I. Pretzman, Noel L. Greenlec, Columbus, Ohio, on the brief), for appellants.

George E. Netter, New York City, Robert S. Marx, Cincinnati, Ohio (Robert N. Gorman, Cincinnati, Ohio, Robert Dow Hamilton, Columbus, Ohio, on the brief), for appellees.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

MILLER, Circuit Judge.

Appellees, minority stockholders in The Seagrave Corporation, hereinafter called Seagrave, brought a stockholders' derivative suit against Seagrave and its officers to enjoin them from carrying out a proposed transaction between Seagrave and Herbert A. Post, Incorporated, hereinafter called Post, which provided for the purchase by Seagrave from Post of all the common stock of The Fyr-Fyter Company, hereinafter called Fyr-Fyter, on the ground that it was unfair to Seagrave and its stockholders and in violation of the fiduciary duty of the officers and dominant stockholders to Seagrave and all its stockholders. The District Judge held the plan to be unfair and illegal, and enjoined the defendants from consummating the transaction. Separate appeals by Seagrave and by its officers were consolidated and heard together.

The underlying facts, which are not in controversy, are as follows: Seagrave, a Michigan Corporation, has its principal place of business in Columbus, Ohio. Its principal product is motorized fire-fighting equipment. It has an authorized capital of 125,000 shares of common stock of the par value of $5 per share, of which there are issued and outstanding 122,700 shares. The ten plaintiffs own 800 shares.

The Fyr-Fyter Company, an Ohio corporation, is engaged in the manufacture

of portable fire extinguishers and other items of fire-fighting equipment. Its capital consists of 40,000 shares of common stock of the par value of $5 per share, owned by Herbert A. Post, Incorporated, and 20,000 shares of 5% cumulative preferred stock of the par value of $30 per share, of which William McKinley Wetzel owns at least 9,485 shares, and Mr. Marlier, a friend and business associate of Wetzel, owns 10,000 shares. Wetzel is the owner of all the issued and outstanding stock of Post. Fyr-Fyter owns the stock of the Wooster Brass Company, which it operates as a division of its business.

Seagrave's chief competitor is American-LaFrance Foamite Company, which not only manufactures motorized firefighting equipment, but also portable fire prevention equipment, such as is manufactured by Fyr-Fyter. Seagrave has no affiliation with any company manufacturing portable fire prevention equipment.

The proposed transaction now under attack would join Seagrave with Fyr-Fyter and its subsidiary the Wooster Brass Company for the purpose of enabling Seagrave to better meet the competition of American-LaFrance. The plan provides for the purchase by Seagrave from Post of all of the common stock of Fyr-Fyter, in consideration of the issuance and delivery to Post of 146,084 shares of Seagrave common stock, and for the purchase by Seagrave from the holders thereof of not less than 95% of the 20,000 shares of 5% cumulative preferred stock of Fyr-Fyter of the par value of $30 per share, in consideration of the issuance and delivery to such preferred shareholders of Fyr-Fyter shares of 5% cumulative preferred stock of Seagrave, of the par value of $30 per share, on a share for share basis. This required that Seagrave increase its authorized common stock to 268,784 shares and create a new issue of 20,000 of 5% cumulative preferred stock of the par value of $30 per share. The plan provided for an increase in the authorized common stock

to 368,784 shares, thus authorizing 100,000 shares of unissued common stock. A written agreement of date August 26, 1952 was entered into between Seagrave and Post containing the foregoing provisions.

As a part of the over-all plan, Wetzel, who owns all of the outstanding stock of Post, entered into contracts with approximately thirty stockholders of Seagrave for the purchase of 35,000 shares of the Seagrave stock at a price of $20 per share. Of these 35,000 shares, Arthur A. Marcus and Charles B. Wilkes, two of the seven Seagrave directors, are selling 1700 shares and 15,700 shares respectively. This purchase is conditioned upon consummation of the contract between Seagrave and Post and its approval by a majority vote of all outstanding Seagrave stockholders, after deducting from the total outstanding shares the stock of those stockholders who were under contract to sell to Wetzel. This contract provides that the selling stockholders deliver to Wetzel, on the closing date therein referred to, the written resignations of four directors of the Company.

Following approval of the plan by the Board of Directors of Seagrave, it was submitted to a special meeting of the stockholders of Seagrave on September 29, 1952, at which 97,168 shares voted in favor of the purchase, and 6,673 shares voted against the purchase. This action was filed shortly prior to the stockholders' meeting, but by agreement the meeting was permitted to be held, but completion of the transaction was stayed pending the final ruling of the Court upon the merits.

The evidence showed that as of June 30, 1952, Seagrave had capital and surplus of $2,377,158.37, while Fyr-Fyter and its subsidiary had capital and surplus of $1,087,986.72. For the four and one-half years prior to June 30, 1952 Seagrave earned $1,661,681, while Fyr-Fyter and its subsidiary earned $842,095. In the eleven and one-half years prior to June 30, 1952 Seagrave earned $2,160,804, while Fyr-Fyter and its sub-

sidiary earned $2,810,396. The years 1943–1947 were poor years for Seagrave. Its net earnings in 1946 and 1947 dropped to $25,213 and $36,791 respectively from $130,053 in 1941 and $124,609 in 1942. In 1948, they jumped to $322,567. On the other hand, Fyr-Fyter and its subsidiary had two of its best years in 1946 and 1947 with net earnings of $318,244 and $334,393 respectively. In 1948, its net earnings were $298,268. The book value of the shares of Seagrave as of June 30, 1952 was $19.37 per share. Upon consummation of the plan it would be $10.29 per share. The high and low sales prices on the New York Stock Exchange on August 22, 1942 for Seagrave common stock was 15 and 14½ respectively.

The evidence also showed that a group of investors, headed by Charles B. Wilkes, Arthur A. Brown, and Morton Globus, of New York City or environs, had over a period of time accumulated sufficient stock of Seagrave to constitute by the spring of 1951 a working majority for the election of directors and to enable them to accomplish the replacement of a majority of four of the seven board members with directors of their own choosing at the annual meeting in March 1951. This stockholder group, referred to as the Wilkes group, are represented on the board by Charles B. Wilkes, Robert B. Wilkes, Arthur A. Marcus and John J. McCarthy. The other three directors are H. B. Spain, President, J. Lester Stevenson, Vice-President, and Allen Pretzman, Counsel and Chairman of the Board, who constitute the active management. Their connection with the corporation long antedates that of the Wilkes group. Spain, Stevenson and Pretzman have been in disagreement with the dominant Wilkes group. The Wilkes group was insistent upon a dividend in excess of the current earnings which was strongly opposed by the management group. This, together with other differences, made an unhappy situation for these three to the extent that their resignations were probable if the Wilkes group continued to dominate the Board. Under the plan, the four members of the Wilkes group would resign as directors, Wetzel would name their successors, and Spain, Stevenson and Pretzman would continue with the Company, with Pretzman becoming local counsel and director instead of Counsel and Chairman of the Board.

The Proxy Statement, sent out in connection with the stockholders meeting, gave the details of the plan together with appropriate background and financial information about the two companies. It recited the purpose and advantages of the plan. It referred to the proposed purchase by Wetzel of 35,000 shares at $20 per share and contained the statement, "such price being approximately one-third higher than the current market on the New York Stock Exchange." It stated the proposed change of directors effective upon the consummation of the plan, advising that it was the intention of the Board to elect as the four new directors Wetzel and three others to be nominated by Wetzel, who had "not yet been determined." It stated that consummation of the plan would vest voting control in Wetzel, who "does not at present contemplate any substantial change in the operating management." No reference was made to any existing differences among the present directors. It stated that the Board of Directors of Seagrave (Arthur A. Marcus opposing) had approved the plan. The reason for the negative vote of Marcus was not given.

The District Judge found that the conflict between the members of the Board of Directors was so bitter and intense that if it continued the logical consequences appeared to be either the resignation or discharge of Pretzman, Spain and Stevenson from their respective positions as Counsel, President and Vice-President of Seagrave; that Wetzel, who would gain control of Seagrave if the plan was consummated, had promised to continue to employ Pretzman, Spain and Stevenson in their respective positions with the Corporation; that the proxy statement did not inform the stockhold-

ers of the conflict among the directors or of the fact that Pretzman, Spain and Stevenson had definite reasons to believe that their continued employment by the Corporation would be more certain if the plan was consummated; that the members of the Wilkes group who would sell 35,000 shares of common stock to Wetzel under the plan would receive approximately $6 per share in excess of the current market value, or a total of more than $200,000 in excess of the current market value of said common stock; that the invested capital of Seagrave was several times greater than that of Fyr-Fyter and its subsidiary Wooster Brass; that in the last four and one-half years Seagrave earned for its common stockholders $1,661,681 while during the same period Fyr-Fyter and its subsidiary Wooster Brass earned $842,095; that each of the Directors had a substantial personal interest in the consummation of the proposed plan; that in the case of the four Directors representing the so-called Wilkes group the interest of such Directors and of the group which they represented was clearly in conflict with the interest of the minority stockholders; that these four directors did not act in the unprejudiced exercise of their judgment for the benefit of Seagrave and all its stockholders, but acted primarily in the special interest of the controlling group of stockholders; that Directors Pretzman, Spain and Stevenson, in considering and approving the proposed plan, did not act in the unprejudiced exercise of their judgment for the benefit of Seagrave and all its stockholders, but acted primarily because of their desire to continue in their present positions; that the plan was inequitable, unfair and illegal; that the Directors in considering and approving the proposed plan did not act in good faith or with reasonable care, but on the contrary violated their fiduciary duties as directors; that the proxy statement was inadequate, incomplete, misleading, unfair and did not fairly inform the stockholders of all the material facts; and that the approval by the majority of the stockholders of the proposed plan, which was in violation of the principles of equity, was not binding upon the stockholders or the Corporation.

■ Appellees contend that these findings are supported by the evidence, are not clearly erroneous, and must be accepted on this review under Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A. Appellants contend that since substantially all of the testimony was submitted to the Court in written form with the District Judge not seeing or hearing the witnesses, the District Judge had no better opportunity of judging the credibility of the witnesses than does this Court, and that the findings of the District Judge are not accorded the finality which would otherwise attach under Rule 52(a). This appears to be the prevailing view throughout the Circuits. Letcher County v. De Foe, 6 Cir., 151 F.2d 987, 990; Orvis v. Higgins, 2 Cir., 180 F.2d 537, 539; Bowles v. Beatrice Creamery Co., 10 Cir., 146 F.2d 774, 780; Equitable Life Assur. Soc. v. Irelan, 9 Cir., 123 F.2d 462, 464; State Farm Mut. Automobile Ins. Co. v. Bonacci, 8 Cir., 111 F.2d 412, 415; Himmel Bros. Co. v. Serrick Corp., 7 Cir., 122 F.2d 740, 742. Accordingly, we do not accept the findings as controlling. The documentary and statistical evidence, including the details of the plan, are not in dispute, but we will make our own evaluation of the conclusions to be drawn from them on this review. Letcher County v. De Foe, supra.

Appellees successfully contended in the District Court, and renew the contention here, that the underlying provisions of the plan caused the proposed purchase to be unfair and equitable to the minority stockholders of Seagrave. They rely chiefly upon the material difference in the net assets of the two companies, the fact that the earnings of Seagrave over the past four and one-half years were approximately double those of Fyr-Fyter and its subsidiary, and the decrease in book value of Seagrave stock from $19.37 per share to $10.29 a share upon consummation of the plan. Appel-

lants urge upon us that the fairness of the plan involves numerous factors, including, in addition to the ones referred to, such intangible ones as good will, effect of existing patents, recent and prospective earning power, and the competitive situation in the industry. They point out that regardless of the difference in the net assets, the annual net profits of Fyr-Fyter have been more consistent than those of Seagrave, and over the period of the past eleven and one-half years, instead of the four and one-half considered by the District Judge, Fyr-Fyter's net profits have exceeded those of Seagrave. They contend that the economic fairness of the plan is a matter of business judgment, in the exercise of which the action of the Board of Directors and the majority of the stockholders is controlling, and that majority stockholders are at liberty to dispose of their shares at any time and for any price to which they may agree without being liable to other stockholders.

■ As a general proposition appellants are correct in this contention. United Milk Products Corp. v. Lovell, 6 Cir., 75 F.2d 923, 927, certiorari denied 295 U.S. 751, 55 S.Ct. 831, 79 L.Ed. 1696; Roby v. Dunnett, 10 Cir., 88 F.2d 68, 69. However, there are recognized exceptions to the general rule, such as where fraud is involved in the actions of the dominant directors and stockholders, where controlling stockholders turn over their shares to purchasers who mismanage the corporation or loot the corporate assets, where non-controlling stockholders are induced to sell their shares by concealment of the fact that a premium is to be paid to the controlling stockholders, where controlling stockholders or directors make a secret profit from a transaction, or where directors are dealing directly with the corporation to their own personal advantage, known or unknown. Ashman v. Miller, 6 Cir., 101 F.2d 85, 90; Oil Shares v. Kahn, 3 Cir., 94 F.2d 751, reversed on other grounds, Oil Shares v. Commercial Trust Co., 304 U.S. 551, 58 S.Ct. 1059, 82 L.Ed. 1522; Kroese v. General Castings Corp., 3 Cir.,

179 F.2d 760, 763, 15 A.L.R.2d 1117; Moulton v. Field, 7 Cir., 179 F. 673; Insuranshares Corp. of Delaware v. Northern Fiscal Corp., D.C., 35 F.Supp. 22.

■ A recognition of this general principle and the exceptions to it removes from the case a great deal of what has been argued to us by the parties on this appeal. The fairness of the plan to the stockholders of Seagrave is questionable, but its provisions are not so inequitable or so at variance with what sound business judgment would call for under existing business conditions, as to constitute actual fraud on the part of the directors. We find it unnecessary to discuss and compare the alleged inequities and the claimed advantages. It is a matter which addresses itself to the business judgment of the directors and those in control of the destinies of Seagrave. United Milk Products Corp. v. Lovell, supra, 75 F.2d at page 927.

■ We also agree with appellants' contention that the case does not fall within any of the other classifications referred to above, such as where directors are dealing directly with the corporation for their own personal advantage, or are making a secret profit for themselves in a corporate transaction. The profit from the sale of their stock to Wetzel at $20 per share was fully disclosed by the Proxy Statement.

■ Appellees' contention and the finding of the District Judge, that the Proxy Statement was incomplete, misleading, and did not fairly inform the stockholders of the material facts, are not, in our opinion, sustained by the evidence. The factual situation is explained in detail by the Proxy Statement, which contains a copy of the Plan and financial statements of the two companies giving the information hereinabove referred to. It appears to us to be a complete and fair statement of the Plan and the expected result of the merger. Appellees strongly stress its failure to refer to the existing differences between the two factions on the Board of Directors. As hereinafter pointed out, we think such dissen-

tion plays a part in the final ruling on this case. But it has little, if any, bearing on the intrinsic merits of the Plan, and is an intangible factor difficult to accurately portray, any statement of which is potentially misleading or prejudicial to at least some of the stockholders. What effect, if any, it would have had on the voting is not shown. In our opinion, a statement concerning it in the Proxy Statement, would have probably influenced votes in favor of the Plan, and would have been definitely prejudicial to appellees. We do not consider the omission prejudicial to appellees.

We are of the opinion, however, that the case is controlled by the fundamental principle of equity governing the personal transactions of fiduciaries in matters involving the interests of those to whom the fiduciary duty runs. As expressed by then Chief Justice Cardozo of the Court of Appeals of New York in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honestly alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions."

A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Southern Pacific Co. v. Bogert, 250 U.S. 483, 491–492, 39 S.Ct. 533, 63 L.Ed. 1099; Wagner Elec. Corp. v. Hydraulic Brake Co., 269 Mich. 560, 566, 257 N.W. 884. When the dual relationship of individual and fiduciary creates a conflict of interest the fiduciary relationship must prevail. The Supreme Court said in United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, at pages 263–264, 37 S.Ct. 509, at page 510, 61 L.Ed. 1119, that questions of internal management are ordinarily left to the discretion of the directors, and "Courts interfere seldom to control such discretion intra vires the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or *where they stand in a dual relation which prevents an unprejudiced exercise of judgment; \* \* \**." (Emphasis added.) This was repeated with approval by this Court in United Milk Products Corp. v. Lovell, supra, 75 F.2d 923, 927. In Ashman v. Miller, supra, 101 F.2d 85, 91, we again said: "It is too plain for citation of authority that a director of a corporation cannot barter or sell his official discretion or enter into any contract whatever that will in any way restrict or limit the free exercise of his judgment and discretion in his official capacity, nor can he place himself under any direct and powerful inducement to disregard his duty to the corporation and its stockholders in the management of corporate affairs." See also: Thomas v. Matthews, 94 Ohio St. 32, 43, 60, 113 N.E. 669, L.R.A.1917A, 1068.

In the present case, we are of the opinion that the personal interest of the directors representing the Wilkes group was involved to an extent which interferred with the unprejudiced exercise of judgment to which the minority stockholders were entitled. As part of their contract of purchase on behalf of Seagrave from Post (in practical effect Wetzel) they were at the same time selling for themselves and others to Wetzel 35,000 shares of Seagrave stock at a price of $5 or more per share than was available on the open market. This price was not available to the minority stockholders. Nor was the purchase of any of this stock by Wetzel necessary to give Wetzel a majority of the voting stock of Seagrave. Against the background of dissention in the Board of Directors, the possibility of such an advantageous sale of this stock interest necessarily injected

into the picture a personal interest which could affect the exercise of unprejudiced judgment with respect to the interests of the corporation and the minority stockholders. The desire of the three management directors to get rid of the Wilkes group, to end the dissention which threatened their positions with the Company, together with Wetzel's stated intention to make no substantial change in operating management if the plan was consummated, likewise injected into the picture a personal interest on the part of these three directors in favor of consummating the plan. Whether conscious of the effect or not, the combination of such factors deprived the stockholders of that impartial, unprejudiced action which the fiduciary relationship required.

■■■■■■ Although good faith on the part of the Directors and the disclosure of the material facts eliminate the question of actual fraud, equity will still act to enforce the fiduciary obligation under circumstances amounting to constructive fraud. Constructive fraud refers to acts which may have been done in good faith, with no purpose to harm the corporation, but which are done by one who has placed himself in a position of conflict between a fiduciary obligation and his own private interests. In such a situation, by reason of the strict rule applicable to fiduciaries, equity will take appropriate action to prevent the harm resulting from such actions, regardless of the good intentions of the fiduciary. Levitan v. Stout, D.C.W.D.Ky., 97 F. Supp. 105, 117; Epstein v. United States, 6 Cir., 174 F.2d 754, 765–766; Hyams v. Calumet & Hecla Mining Co., 6 Cir., 221 F. 529, 542–543.

■■■■■ Appellants contend that because a large majority of the shares voted at the stockholders' meeting were in favor of the purchase, the action of the directors was ratified. We must take into consideration the influence of the Wilkes group, the solicitation and use of proxies by management, and the previous action of the directors in determining the effect of such an alleged ratification. Under the circumstances, we do not consider it a valid ratification. Hyams v. Calumet & Hecla Mining Co., 6 Cir., supra, 221 F. 529, 541–542; Kahn v. Schiff, D.C.S.D. Ohio, 105 F.Supp. 973, 976. See also Geddes v. Anacondo Mining Co., 254 U.S. 590, 591, 599, 41 S.Ct. 209, 65 L.Ed. 425. In any event, in order to amend the charter, as required by the Plan, it was necessary under the law of Michigan, the State of incorporation, to obtain the vote of the majority of the outstanding shares, which would require 61,351 shares. Not counting the vote of the 43,000 shares of the Wilkes group, only 53,979 shares voted in favor of the proposed change.

The judgment is affirmed.

ALLEN, Circuit Judge (dissenting).

I regret that I cannot agree with my brothers. While Fyr-Fyter has a smaller invested capital than Seagrave it has made money much faster than Seagrave and paid dividends more steadily over a period of years. It has outstanding 20,000 shares of preferred stock and the record shows that all dividends are fully paid and not in arrears. Seagrave paid no dividends from 1941 through 1947 and in recent years it has paid dividends in an amount greater than its net earnings.

The invested capital of Seagrave is over four times that of Fyr-Fyter but during the period involved Fyr-Fyter earned more than Seagrave, the comparison being $2,160,804 for Seagrave and $2,810,396 for Fyr-Fyter during an eleven and one-half year period. The four New York directors of Seagrave insisted that dividends be paid when the corporation was not earning the amount of the dividend insisted upon. In 1951, although Seagrave earned $1.04 a share, the Wilkes group, the four New York directors, against the objection of management and the banks, declared dividends of $1.20 a share. One of the New York banks notified Seagrave that if that policy continued it would have to refuse credit. The management, which had

long been employed by Seagrave, (the president of the company having been a director since 1925) was opposed to the policy of declaring dividends in an amount which had not been earned and the president threatened to resign if that policy were continued.

Wetzel was unwilling to agree to the plan unless he could secure control. Control could be obtained only by resignation of the New York directors, who were in turn controlled by the Wilkes group of stockholders holding 43,000 shares. To secure their stock Wetzel offered the Wilkes group a price substantially above the market and made full disclosure of this offer as well as of the fact that he planned to secure control. As stated in the proxy:

"At the present time voting control of your Corporation is vested theoretically in its public stockholders; however, actual working control apparently exists in the group of stockholders listed in Exhibit C hereinafter mentioned. [The Wilkes group] Upon consummation of the Plan, voting control will be vested in Wm. McKinley Wetzel through his ownership, directly and indirectly, of approximately 9,485 shares of Preferred stock (out of a maximum of 20,000 shares to be issued and outstanding) and 181,084 shares of Common Stock (out of approximately 268,784 shares to be issued and outstanding)."

Wetzel also wished to retain Seagrave's experienced management. He discussed with each of the officer-directors their attitude as to remaining with Seagrave and apprised them that he wished them to stay and work with him. There was no evidence that any of these officers expected to be or was likely to be removed. Spain, the president, had been a director for 28 years. No contracts were executed between Wetzel and the management and no rate of compensation was mentioned.

I think there is no evidence of fraud, bad faith, or breach of fiduciary duty in the proposal and approval of this plan.

While the obligations of fiduciary relationship in corporations are imposed both upon directors and upon dominant or controlling stockholders, Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Hyams v. Calumet & Hecla Mining Co., 6 Cir., 221 F. 529, in the absence of fraud, secret profits, dealing with the corporate assets, or concealment of material matters, mistakes of judgment upon the part of the directors do not justify the interference of a court of equity. McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877; Wolfes v. Paragon Refining Co., 6 Cir., 74 F.2d 193. It is uncontradicted that none of the directors were dealing with the corporation nor personally dealing with the corporate assets. Under the plan a transfer of less than one-half of the stock of the corporation was involved in an arm's length transaction between two independent organizations. The proposed exchange of the preferred stock of Seagrave for the preferred stock of Fyr-Fyter was equally matched in amount and par value of stock. The fact that the controlling group of stockholders was to receive a price for the stock above the market was fully disclosed in the proxy statement. Only two of the directors benefited by receiving $20 per share for their common stock in Seagrave. They did not constitute a majority of the directors and their vote recommending adoption of the plan was not controlling.

My brothers hold that the vote of the three officer-directors in favor of the plan constituted a breach of fiduciary duty and the District Court so held. I think there is no evidence of bad faith or breach of fiduciary duty by the officer-directors. Wetzel's statement, included in the proxy, which fully revealed to the stockholders that he intended to retain the present management, was entirely informal. No contract to that effect was executed. The arrangement hardly could have motivated the vote of Pretzman, one of the officer-directors, for he was to be demoted from general counsel to local counsel and was no longer to be chairman

of the board. There is not a scintilla of evidence that the officers were in danger of losing their positions with Seagrave nor that this circumstance influenced their vote as directors on the plan.

It is a general rule that a stockholder has a right to sell his stock and that selling it for his own personal interest involves no breach of a fiduciary relationship. Gamble v. Queens County Water Co., 123 N.Y. 91, 25 N.E. 201, 9 L.R.A. 527. This is true though a stockholder is selling a majority of the stock and though the purchasers are willing to pay a larger price to one holding control. Levy v. American Beverage Corp., 265 App.Div. 208, 38 N.Y.S.2d 517. Moreover, a director or officer has the same right as any other stockholder to sell his stock to another. He does not stand in a fiduciary relation to another stockholder in respect to his stock. U. S. Steel Corporation v. Hodge, 64 N.J.Eq. 807, 54 A. 1, 60 L.R.A. 742; Nelson v. Northland Life Ins. Co., 197 Minn. 151, 266 N.W. 857. The limitation imposed upon this general rule is that the action resulting from the sale must not be a wanton or fraudulent destruction of the rights of the minority. Gamble v. Queens County Water Co., supra.

Against the background of Seagrave's uncertain profits and the very real advantages probable from the opening of new and profitable lines of production for Seagrave, combined with the assistance not before available of a far-flung corps of distributors, the transaction was far from a wanton or fraudulent destruction of the minority stockholders' rights. The vast majority of the stockholders considered it good business. Concealment, which is so frequently evidence of fraud in dealings between directors, officers, and corporations, was wholly lacking. All of the material elements of the transaction, including the price to be paid the Wilkes group, the securing of control by Wetzel, and his intention to retain the present management were fully disclosed to the stockholders. The audited reports of Fyr-Fyter's financial operation were available before the stockholders' meeting. The District Court's finding on concealment is not sustained by the evidence.

As to the question of financial advantage from the transaction, appellees urge that the book value of the Seagrave stock would be materially diluted by the issue of new stock. This is true, but book value is only one element to be used in appraising a going corporate business. The earnings, the payment of dividends over a substantial period, success in the competitive field, efficient management, and good will must be considered. Under the plan Fyr-Fyter's valuable patents would be available to Seagrave. The financial record of Fyr-Fyter with its regular earnings over 11½ years, including the difficult war years, and its regular payment of dividends evidently held out to the directors and stockholders of Seagrave the justifiable hope that the diluted stock would eventually earn more than the undiluted stock had earned during the period involved. Any apparent unfairness arising from the fact that Seagrave had several times the invested capital of Fyr-Fyter disappears "when the condition and earning capacity of the two companies are critically examined." Colby v. Equitable Trust Co., 124 App.Div. 262, 108 N.Y.S. 978, 983, affirmed 192 N.Y. 535, 84 N.E. 1111.

The District Court selected the 4½ years which were most prosperous for Seagrave, compared those years with the earnings of Fyr-Fyter during the same 4½ years, ignoring the other years of the 11½ year period in evidence, so that Fyr-Fyter's earnings were under valued. The two companies are in the same line of business, affected by the same problems, and their average earnings over 11½ years present a truer picture of their relative financial situation than that presented by the shorter period. While no one could guarantee the outcome of the consummation of the plan, the great majority of the stockholders in whose hands the government of the corporation ultimately resides voted for the plan.

The judgment should be reversed.